## Davidson's Estate.

Argued March 27, 1939. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN and STERN, JJ.

*Hugh C. Boyle,* with him *Charles McC. Barrickman,* of *Buchanan & Barrickman,* for appellant, No. 99, and for appellees, Nos. 100, 104 and 106.

*Thompson Bradshaw,* of *Bradshaw, McCreary & Reed,* for appellant, No. 117, and for appellees, Nos. 101, 105 and 107.

*Leonard L. Ewing,* with him *Harold F. Reed,* of *Reed & Ewing,* and *Robert L. Orr,* for appellees, Nos. 99 and 117, and for appellants, Nos. 100, 101, 104-107.

OPINION BY MR. JUSTICE STERN, May 8, 1939:

We are here called upon to review the amounts allowed by the court below as compensation to a co-executor and to counsel of a decedent's estate. The heirs have appealed on the ground that the awards were excessive, the recipients on the ground that they were inadequate.

Decedent died, testate, in August, 1930, leaving an estate the gross assets of which were then valued at approximately $1,223,000, of which $1,089,000 was personalty and $134,000 real estate. Of the four executors named in his will, two renounced their right; the others, Samuel K. Davidson and The Bank of Pittsburgh National Association, served in that capacity for seven

years. Decedent had been a stockholder in the bank and a member of its board of directors, and at the time of his death was indebted to it to the extent of about $180,000, of which $125,000 consisted of liability on his own notes and $55,000 of liability on a note of the Union Hotel Company which he, with others, had guaranteed. The total indebtedness of the estate was somewhat over $400,000.

In their final account, filed in November, 1937, the executors asked for $39,765.67 as compensation. No objection was made to Samuel K. Davidson being awarded one-half of that amount, but the court allowed to the bank only $7,500.*

In the financially tumultuous years of 1931 and 1932 the market value of the assets declined greatly and the estate became to all intents and purposes insolvent; indeed only a few of its securities were then marketable. The Bank of Pittsburgh itself went into receivership in September, 1931. From then on, under the administration of successive receivers, it pursued a policy as executor designed to protect its own interests and attempted to secure a prompt liquidation of the indebtedness due it, whereas the estate struggled to obtain extensions that would enable it to tide over the economic emergency in the hope that an improvement of conditions would restore to the assets their normal value. An agreement was entered into in January, 1932, between the heirs, the executors, and the then receiver of the bank, whereby approval was given by the heirs to

---

* The bank asserts the existence of an agreement with its co-executor Samuel K. Davidson whereby their compensation was to be shared equally. Mr. Davidson questions the scope and the binding force of this agreement under the conditions which subsequently developed. This controversy has no place in the present proceedings. If the bank considers itself entitled to recover part of the compensation given to Mr. Davidson it must seek recovery from him by an action of assumpsit in the common pleas: *Joseph Walker's Estate*, 9 S. & R. 223, 225; *Wickersham's Appeal*, 64 Pa. 67, 69; *Catanach's Estate*, 273 Pa. 368, 374.

the execution by the executors of a demand collateral note to the bank covering the liability of the decedent as one of the guarantors of the Union Hotel Company obligation, and to the pledge of certain securities as collateral for this note and the other indebtedness to the bank. This agreement, however, cleared the atmosphere only temporarily. The receiver had previously given instructions to brokers to sell the securities of the estate, although if such sale had then been effected it would have been ruinous, and he had also, without consultation, transferred the securities from the trust department to the commercial side of the bank as security for all the obligations to the bank. The result was that counsel for the estate was obliged to make vigorous efforts to secure funds from some other source with which to liquidate that indebtedness. An attempt to do this proved abortive for reasons which need not here be discussed, and the receiver again placed the securities in the hands of brokers for the purpose of sale. In May, 1933, an agreement was entered into between the heirs and the executors by which the latter were given permission to sell any or all of the securities and to reinvest the proceeds from time to time as they might deem best. Counsel entered into negotiations with the Comptroller of the Currency at Washington, with the result that, in July, 1933, a two-year extension was obtained from the receiver. With the breathing time thus given, and successful handling of the securities, principally by Mr. Davidson, the estate was largely enhanced in value, and in June, 1934, the bank's claim was paid in full.

The court below found as a fact that "it was the policy of the receiver of the bank, and as executor of the estate, to constantly subordinate the interests of the estate to the interests of the bank as a creditor of the estate. Such policy was inimical to the estate and placed its assets in jeopardy." The court also found that the receiver had acted "for the purpose of protecting the

interests of the bank and without regard to its effects on the interests of the estate," and that "the estate, by reason of the conduct of the receiver, has been subjected to much greater expense for legal services." Considering the case in the light of these facts, the court concluded that since no constructive services were rendered by the bank after the initiation of the receivership, but that, on the contrary, its attitude then became hostile and troublesome, compensation should be allowed to it only for its services during the period prior to the receivership, at which time it had acted coöperatively and helpfully as an executor, and for the clerical services and the facilities of the bank of which the estate made use during the period of the receivership and until the resignation of the bank as an executor in September, 1937. The court therefore allowed compensation in the reduced amount of $7,500.

Both appeals from this award must fail. The heirs claim that the bank, by its antagonistic conduct, forfeited all right to compensation. This position is unwarranted because the bank did render some service and was not guilty of fraud, dishonesty, or breach of any legal duty. On the other hand, the bank cannot successfully assert that it was not fairly treated in the allowance made to it. It argues that it had the right of "retainer" (3 Bl. Comm. 18; *Ex parte Meason,* 5 Binney 167), that is, in modern language, that, as a creditor, it was justified in insisting upon payment of its claim against the estate, and, as executor, in making such payment to itself. This, of course, is true; it did have such a right, which the heirs at all times recognized. But a different question arises when the bank seeks *compensation from the estate* for labors involved in exercising the right. It cannot claim that the estate should pay it for services rendered, not for the benefit of the estate, but primarily for its own interests, even though, admittedly, there was nothing illegal in its pursuing those interests. The court did not reduce the bank's

compensation by way of a penalty for its conduct; what it did was, in measuring the value of the bank's services, to eliminate from consideration the efforts made to collect its own claim. (See Restatement, Trusts, section 243, comment a.)

From what has been said it should be clear that there is here applicable the familiar principle that where the auditing judge and the court below have fixed the compensation of a fiduciary, the order will not be reversed on appeal in the absence of manifest error: *Moore's Estate (No. 1)*, 211 Pa. 338, 343; *Brooks' Estate*, 249 Pa. 66, 68; *Huff's Estate*, 300 Pa. 64, 68; *Griffith's Estate*, 96 Pa. Superior Ct. 242, 245.

We come to a consideration of the award of counsel fees. Here, too, both appeals must fail. The amount requested by counsel, C. Roscoe Hoffman, Esq., was $75,000; the court allowed $30,000. It is unnecessary to rehearse in detail the services of Mr. Hoffman in the more or less routine matters which he was called upon to render. There were agreements to be prepared and tax adjustments to be made, and he produced in evidence an imposing itemization of conferences, telephone calls, and other time-consuming engagements characteristic of the administration of an estate of the magnitude of the present one, especially in view of the unmarketable nature of the securities which composed it. Counsel, however, frankly admitted that the reason why he believed himself entitled to the large fee which he claimed was not the size of the estate nor the duration or extent of the ordinary legal services rendered by him. The basis of his claim is that, if the receiver of the bank had been allowed to liquidate the securities in 1931 and 1932, the result would have been hopeless insolvency, whereas by staving off such action and by obtaining a respite from the Comptroller of the Currency he secured for the estate the opportunity which enabled Mr. Davidson, by taking advantage of better market conditions and making judicious investments, to rescue the

estate from a condition of insolvency and bring it finally to a position where it showed a net worth of nearly $700,000. Mr. Hoffman considers the obtaining of the two-year extension from the receiver of the bank through the Comptroller of the Currency a somewhat extraordinary accomplishment, an attainment which represented not only industry but genius, and which alone made ultimately possible the successful administration of the estate. The heirs, on the other hand, while admitting that Mr. Hoffman's services in that regard were valuable and that he is to be commended for his diligence and skill in obtaining the extension, say, nevertheless, that his achievement was one that any member of the bar of average ability could have accomplished. These different views are reflected in the startlingly contradictory testimony given by two sets of expert witnesses, the one consisting of a number of eminent members of the bar called by Mr. Hoffman, and the other of approximately an equal number of eminent lawyers called by the heirs. The former group ranged in their estimates as to what was a fair and reasonable fee from $50,000 to $85,000; the latter from $11,000 to $20,000. Truth is usually to be found in medial zones, and the court fixed the fee at $30,000. The very fact of such a great discrepancy in the testimony of lawyers whose good faith and disinterestedness are beyond all question indicates the difficulty which confronted the court in determining what was proper compensation, especially since the services of counsel were of a nature requiring business sagacity rather than professional competency in the law as ordinarily understood. We cannot say that the award was exorbitant, neither can we say that it was inadequate. The amount to be allowed for counsel fees, as for compensation of fiduciaries, is peculiarly within the discretion of the court of first instance, and its judgment will not be disturbed except for manifest abuse of discretion: *Good's Estate,* 150 Pa. 307, 310; *Wood's Estate,* 272 Pa. 8, 12; *Rambo's*

*Estate,* 327 Pa. 258, 266; *Harton's Estate,* 331 Pa. 507, 523; *Holman's Estate,* 102 Pa. Superior Ct. 198, 202.

The decree of the court below is affirmed, the parties to bear their respective costs.