## Williams Estate

*Hillegass & Moran*, for accountants.

*Wright, Mauck, Hawes & Spencer* and *Townsend, Elliott & Munson*, for exceptants.

TAXIS, P. J., January 19, 1956.—J. Ambler Williams died on September 29, 1951, leaving a last will and testament bearing date January 21, 1950, duly probated on October 4, 1951, on which the present letters were granted to the accountants, who were appointed executors. . . .

At the audit, numerous objections to the account of the executors were filed by Mary Louise Bromley,

daughter of decedent. All objections were withdrawn except those challenging the amount of counsel fees and executors' commissions.

In the account, Hillegass and Moran, attorneys, have claimed a fee of $27,000, and at the audit of the account, J. B. Hillegass, Esq., on his appearance slip, requested an additional counsel fee of $23,000, or a total of $50,000 counsel fees. At the time this account was first called for audit on December 21, 1953, before the late Hon. J. Burnett Holland, testimony was submitted by J. B. Hillegass, Esq., to establish the reasonableness of this counsel fee of $50,000. As previously indicated, the inventory value of this estate was in the amount of $1,003,495.45 and, at the time the account was called for audit, showed principal gains so that the estate amounted to $1,079,-917.55. Income was received in the accounting period in the sum of $122,051.77, so that the responsibility of the executors and counsel amounted to a total sum of $1,201,968.72.

In further support of the reasonableness of the counsel fee, there was introduced into evidence for the assistance of the court, a 14-page statement by Mr. Hillegass which related in detail the work, efforts and services rendered. Objector, on the contrary, takes the view that the total counsel fee in this estate should amount to $15,000, and argues that not only is this adequate but is generous compensation for the legal services performed. The counsel fee sought amounts to approximately five percent on the inventory value of this estate.

Briefly summarized the testimony and the 14-page statement of Mr. Hillegass disclose that the work of counsel consisted of:

1. A study of the will.

2. Examination of papers in the office, including examination of deeds, agreements, and insurance

policies. Apparently the personal papers of decedent were not the epitome of orderliness.

3. Inventory and sale of decedent's law library and office furniture.

4. Visits with Mrs. J. Ambler Williams, the widow.

5. Instructions to Howard Williams, son and co-executor with Mr. Moran, concerning management of deposits in bank.

6. Insurance policies and their study, and the contact with beneficiaries.

7. Examination of stock certificates and stock rights.

8. Preparation of inventory and appraisement and State and Federal tax returns, which were "quite involved and necessitated a great deal more work than in a normal estate of this size."

9. Keeping items of income and disbursement current.

10. Met with executors once a week for a period of 27 months.

11. Researched the law concerning the question of improper accumulation of income.

12. Provided for the liquidation of assets to pay debts of approximately $400,000.

13. Provided for the liquidation of stock in a Virginia bank.

14. Provided for liquidation of stock of The Broad Street Trust Company.

15. Considered the problem of marital deduction and the tax saving to the estate.

16. Kept an up-to-date account of 50 different stocks and bonds.

17. Met with the Internal Revenue Department and various tax authorities concerning the tax problems of the estate.

To justify counsel fees of this size the burden of proof is upon counsel to demonstrate that extraordinary and unusual services were performed. Even in that event, the Supreme Court has indicated that three percent in such circumstances would be the maximum fee allowed. See Davidson's Estate, 334 Pa. 389; Wistar's Estate, 192 Pa. 289; Gardner's Estate, 323 Pa. 229. In the last cited case at pages 239-240, the court said:

"Under our cases, where an estate of this size is administered, with assets approaching a million dollars, and particularly where the executor in practical effect exercises the functions of the trustee which it will ultimately become, and where the services and responsibility involved are not of an unusual character, compensation in excess of 3 per cent on *both* income *and* corpus received has rarely been allowed, although compensation of more than 3 per cent has sometimes been allowed on income alone: Wistar's Est., supra; Whelan's App., 70 Pa. 410; Young's Est., 204 Pa. 32, 53 A. 511; Moore's Est. (No. 2), 211 Pa. 343, 60 A. 989; Kelley's Est. (No. 1), 250 Pa. 172, 95 A. 400; Taylor's Est., 281 Pa. 440, 126 A. 809; Griffith's Est., 96 Pa. Superior Ct. 242; Ott's Est., 103 Pa. Superior Ct. 55, 158 A. 286. Each case is sui generis. We think that here compensation equalling 3 per cent on both principal and income is ample."

No useful purpose will be served by relating in more detail than already outlined all the items of service as set forth by J. B. Hillegass. Suffice it to say that I have examined the record with great care, and I am convinced that many of the services rendered are, in fact, not unusual or extraordinary services in an estate of this size at all. In estates of comparable size, there are, of course, bound to be services that are unique and different in type and volume from the usual run of small estates, and in the present case

there was no real estate involved whatsoever; there has been no litigation which has prolonged or protracted the administration of this estate, the personal property itself did not cause any great trouble, but much point is made concerning a law library and office furniture and its public sale, although the amount involved ultimately was only $863.

Objectors called as witnesses two active, practicing Montgomery County attorneys, Paul P. Wisler, Esq., and Samuel H. High, Jr., Esq. They testified that after a review of all the work done by counsel, and of the testimony submitted, it was their opinion that $15,000 would be a fair counsel fee. Both Mr. Wisler and Mr. High conceded that $11,500 (which would be the fee under the minimum fee bill of the Montgomery Bar Association) would be too low in the circumstances of this particular case. No such similar expert testimony was submitted by counsel for the accountants to demonstrate that his services were worth the $50,000 claimed. I am convinced that in the circumstances disclosed by the record and after careful consideration of all the evidence, a total counsel fee of $25,000 is fair, reasonable and, in view of the fact that Mr. Moran of the claimant law firm is also a coexecutor, even generous.

The final objection concerns commissions of the accountants, William J. Moran, Jr., Esq., and Howard D. Williams, son of decedent. The account shows that the accountants have taken a $27,000 commission on principal and, by appearance slip of their counsel, they request an additional commission on principal of $16,196.70, making a total principal commission of $43,196.70, which is equivalent to 4.3 percent of the inventory value of the estate. In addition, accountants have taken five percent commissions on income of $122,051.77, or approximately $6,000, so that total

commissions claimed on both principal and income amount to $49,299.25, or roughly five percent of inventory value.

In support of the reasonableness of these commissions, William J. Moran, Jr., Esq., submitted, on behalf of the two executors, a 12-page statement of extra work performed by the executors and elaborated on this 12-page statement in his testimony. From a reading of this statement and the statement of Mr. Hillegass in the claim for counsel fees, one is impressed immediately with the fact that an overlapping and duplication of effort, in many particulars, has occurred. This is but an expected result of a situation where, as here, a member of the law firm which serves as counsel for the accountants is also one of the accountants.

There is, again, no good reason for, nor would any purpose be served by a detailed narrative or recitation of all the items of services contained in the statement submitted by Mr. Moran. Suffice it to say also, that I have gone over with great care the work set forth in that statement, and have examined carefully the testimony as submitted, and I am convinced that many of the items of service performed by the executors were not unusual in an estate of this size, nor did they pose any problems of wide or unique difficulty. Much is set forth concerning problems of interpretation of the will, although Mr. Moran, one of the executors, was the scrivener of the will and was a close, intimate friend of decedent to the point that interpretation of the will should not have been a substantial or difficult problem. I am convinced, therefore, after an examination of the record and testimony submitted, that compensation to the executors in the total amount of $30,000 on principal is fair and adequate in the circumstances as disclosed by this record. . . .

The account, as modified by this adjudication is confirmed, and it is ordered and decreed that Howard Drake Williams and William J. Moran, Jr., executors, as aforesaid, forthwith pay the distribution herein awarded. . . .

## Exceptions to Adjudication

TAXIS, P. J., March 1, 1956.—Three exceptions were filed to the adjudication dated January 19, 1956, in the above captioned matter. As all three exceptions deal with the one problem they will be disposed of together. The exceptions complain that the auditing judge erred in concluding that the assignment of income in a spendthrift trust by Mary Louise Bromley, income beneficiary and daughter of decedent, on February 25, 1955, was a nullity and must be disregarded.

It is important to distinguish between the rules relating to liabilities of the trustee and those concerning the rights of assignee. As to the trustee, such an assignment acts as an order or direction to the trustee from the beneficiary to make the payments to the assignee. This order is revocable, but until revoked, the trustee encounters no liability in making payments of income as it accrues directly to the assignee in compliance with the beneficiary's order: Keeler's Estate, 334 Pa. 225, 231; A. L. I. Restatement of the Law of Trusts §152(i).

The present case is concerned with the relationship between the assignee and the trustee.

Does an assignee of an unrevoked assignment have a right against the trustee of a spendthrift trust to receive the payment of accrued income from the trust, or is payment of such accrued income to the assignee by the trustee a matter entirely within the discretion of the trustee?

Exceptants claim that the assignment is valid until revoked and that as the assignee, they have an en-

forceable right to the fund of accrued income now before the court. Keeler's Estate, supra, is cited as authority. However, Keeler's Estate is concerned only with the effect of an unrevoked assignment as an authorization to the trustee to pay accrued income to the assignee. Keeler's Estate is not authority for the proposition that such an assignment is a valid one thus creating an enforceable right in the assignee to the accrued increase.

Research discloses no Pennsylvania appellate authority dealing directly with the problem of the validity of such an assignment of accrued income. However, the text writers are unanimous in concluding that payment of accrued income subject to an unrevoked assignment in a spendthrift trust is a matter solely within the discretion of the trustee. A fortiori the assignment cannot be considered to be a valid one and is not enforceable by the assignee.

Bogert, Trusts and Trustees, at §227, page 521, comments: ". . . and attempted assignments by the beneficiary of his rights under the trust will be null and void and need not be recognized by the trustee. The trustee may safely go on paying income to the *cestui*, regardless of the demands of creditors and assignees of the *cestui*." He further points out that a trustee of a spendthrift trust may treat an attempted assignment by the beneficiary as an order on the latter's part to the trustee to pay the income to the assignee, but there is no indication that the trustee must so act.

Scott on Trusts, §155.1, page 778, in discussing the rights of creditors and assignees, notes that neither the assignee nor the creditor can reach the interest of the beneficiary subject to a valid spendthrift provision "If they cannot reach his interest where the trustee is under a duty to pay the income to the beneficiary, clearly they cannot reach it where the trustee

has discretion whether to pay the income to him or not, although the trustee in fact pays the income to him [the beneficiary]."

Griswold, in Spendthrift Trusts, §369, page 449, is in accord. "The essence of the spendthrift trust lies in the inalienability of income to accrue in the future. The restraint, however, does not stop with future income, for the cases generally agree in holding that income which has been received by the trustee, but which has not been paid to the beneficiary, is exempt from the claims of the creditors of the beneficiary."

Judge Hunter, in his Orphans' Court Commonplace Book, vol. 2, p. 1255, notes that unpaid and accumulated income is not subject to assignment, citing Wood's Estate, 28 Dist. R. 5. See Provident Trust Co. of Phila. v. Gordon, etc., 41 D. & C. 188.

Restatement, Trusts, §152, in comment (h) articulates the same result. "A spendthrift trust protects income which has been received by the trustee but has not been paid by him to the beneficiary."

I conclude, therefore, that the language of Keeler's Estate, supra, relied on by the assignee, merely invests the trustee with an authorization to treat the attempted assignment as valid and to make payment to the assignee. Whether this authority will be exercised is within the discretion of the trustee, and until so exercised the assignment must be considered a nullity and disregarded.

Nothing herein said will prejudice the right of the trustee to choose to make payments of future income directly to the assignee until such time as the beneficiary may decide to revoke her assignment.

Accordingly, the adjudication of the auditing judge will not be disturbed, and the exceptions are hereby dismissed.