Binenstock Trust.

426

Argued October 10, 1962. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and KEIM, JJ.

reargument refused April 30, 1963.

*Austin M. Lee,* with him *Frank F. Truscott,* for appellant.

*Perch P. Hankin,* and *Hankin, Hankin & Shanken,* for appellant.

*Harry Shapiro, Irwin Edward Robinson,* and *Shapiro, Rosenfeld, Stalberg & Cook,* for appellants.

*Robert J. Spiegel,* with him *Earl Jay Gratz,* for appellee.

*Cuthbert H. Latta,* for trustees, appellees.

OPINION BY MR. JUSTICE COHEN, March 19, 1963:

In 1943 the Commonwealth of Pennsylvania instituted proceedings in the Court of Common Pleas No. 1 of Philadelphia County against Joseph Binenstock for the escheat of ownerless funds allegedly in his possession. While this litigation was still pending, Binenstock in 1947 created for the benefit of his four daughters and their issue an inter vivos trust consisting of all the capital stock of J. A. Dougherty's Sons, Inc., Distillers (Dougherty). The Commonwealth in 1949 finally obtained a judgment against Binenstock in the amount of $864,924.01 which was affirmed by this Court.[1]

Because the Commonwealth threatened to take action to set aside the trust as a fraudulent conveyance, an agreement was entered into in 1951 between the Commonwealth, Binenstock, and the trustees—approved by the orphans' court—whereby the trustees agreed not to convey any trust assets without the Commonwealth's consent so long as any indebtedness remained, "unless otherwise ordered and directed by the final judgment or decree of a court of competent jurisdiction." In return, the Commonwealth reduced its claim against Binenstock to $756,000, payment to be made in thirty-five installments, and agreed not to proceed against the trust so long as the payments were made.

---

[1] *Commonwealth by Truscott v. Binenstock,* 366 Pa. 519, 77 A. 2d 628 (1951).

Binenstock eventually defaulted on the payments and in October 1961 the Commonwealth brought an action in the common pleas court to set aside the trust as a fraudulent conveyance alleging that $465,000 was still due from Binenstock. The trustees filed preliminary objections to the complaint stating that the orphans' court had exclusive jurisdiction over this trust. That proceeding is still pending.

Meanwhile, the trust was also encountering federal tax difficulties. In order to meet the payments due the Commonwealth, Binenstock secured loans from Dougherty. The federal government claimed, and the tax court held in May 1961, that these loans were, in effect, dividends from Dougherty to the trust and hence subject to federal income tax in the amount of approximately $450,000. Appeals from the decision of the tax court are also presently pending.

Confronted with these claims of creditors totaling approximately $900,000, and believing that the market value of the Dougherty stock might substantially exceed its present net value of $900,000, and realizing that no income had ever been paid to beneficiaries, all four trustees[2] decided in 1961 to seek purchasers for the Dougherty stock. After some investigation, the trustees secured an offer from Robert Fleisher and Raymond Pearlstine whereby 75% of the stock would be sold for $900,000 in cash and, under a "put" arrangement,[3] the trustees could compel the purchasers to buy the remaining 25% for $350,000 within the next

---

[2] The deed of trust originally provided for eight trustees, including the settlor Binenstock. However, the death of Binenstock and the removal of three of the trustees because of their refusal to appeal the decision of the tax court reduced the number of trustees to four.

[3] A "put" is an option in the seller to force the purchaser to buy his property; in contradistinction, a "call" is a similar option in the purchaser.

three years.[4]  *Acceptance of the offer by the trustees was conditioned on the approval of the orphans' court.*

The trustees thereupon filed a petition with the orphans' court for approval of the sale, the petition stating that, *in the absence of a higher offer,* the best interests of the trust would be served by acceptance of the Fleisher-Pearlstine offer. An answer to the petition was filed by one of the income beneficiaries alleging that another purchaser stood ready to buy the stock for a sum substantially in excess of $1,250,000. After hearing testimony on the petition and answer thereto, Judge BURKE concluded that better offers could be obtained for the stock. He consequently ordered a public sale of all the Dougherty stock with sealed bids to be submitted by March 21, 1962. Under the court imposed terms of sale, all bids had to exceed $1,275,000 *and sale was conditioned on the trustees obtaining the consent of the Commonwealth thereto.* If such consent was not obtained by May 31, 1962, the sale was to lapse.

With these conditions of sale, two bids were submitted, the higher offer being that of Publicker Industries, Inc. (Publicker), in the amount of $1,411,000. At this point, Judge BURKE apparently decided to dispense with the need for the Commonwealth's consent to the sale, for he entered a decree directing the trustees to sell the Dougherty stock to Publicker. Exceptions to this decree were filed by the Commonwealth, one of the trustees, one of the beneficiaries, and by the guardian and trustee ad litem.[5] Without ruling on these exceptions, the orphans' court en banc referred the matter back to Judge BURKE for the purpose of taking more testimony. After hearing more than 400 pages of testimony, Judge BURKE confirmed his origi-

---

[4] There was also provision for a $100,000 loan by the purchasers.

[5] The latter had been appointed to represent the interests of minor and unborn beneficiaries of the trust.

430

nal decree and the court en banc affirmed, the final decree expressly stating that the dismissal of the Commonwealth's exceptions was without prejudice to its rights against the proceeds of the sale.

Appeals to this court followed raising five questions for our consideration: (1) whether it was proper for the court below to entertain a petition for sale of trust assets while there was a proceeding pending in the common pleas court to set aside the trust; (2) whether the court below properly refused to approve the Fleisher-Pearlstine offer; (3) whether the court below had the power to order a public sale of the Dougherty stock after disapproving the Fleisher-Pearlstine offer; (4) whether the power to order a public sale of the Dougherty stock could be exercised without the consent of the Commonwealth; (5) whether it was proper for the court below to order a sale of the Dougherty stock without the consent of the Commonwealth after establishing such consent as a condition of the sale. Because of the disposition we make of this case, it is necessary for us to decide all of these questions.[6]

The first question before us concerns the deference which should have been given by the court below to the action commenced by the Commonwealth in October 1961 in the Court of Common Pleas No. 1 of Philadelphia County. It is well-established that orderly judicial procedure dictates that the court which first acquires jurisdiction over a matter be permitted to decide all questions relating thereto. See *Thompson v. FitzGerald,* 329 Pa. 497, 198 Atl. 58 (1938); *Wilson*

---

[6] The appellants before this court are the Commonwealth, one of the trustees, and one of the beneficiaries; the appellees are Publicker and the other three trustees. In addition, we have permitted a prospective purchaser of the Dougherty stock to intervene as appellant. Although these five contentions are not pressed by all of the appellants, we do not deem it necessary or helpful to differentiate the party raising the particular argument.

*v. Board of Directors of City Trusts*, 324 Pa. 545, 188 Atl. 588 (1936). Our problem, therefore, becomes one of determining which court first acquired jurisdiction over this inter vivos trust.

The record reveals that the Orphans' Court of Philadelphia County has exercised jurisdiction over this trust since 1951,[7] a period considerably in advance of the 1961 common pleas action. Appellants contend, however, that the October 1961 proceeding should be "tacked-onto" the earlier 1943 escheat proceeding against Binenstock which was also commenced in the Court of Common Pleas No. 1 of Philadelphia County. But the 1961 action is an independent action prosecuted under the Uniform Fraudulent Conveyance Act to set aside a trust which was not involved in the earlier escheat action. Nor can it be considered as one in execution of the prior in personam judgment. The 1961 action possesses a separate docket number, and it was only by the accidental turn of the prothonotary's wheel that it was listed for the same Court of Common Pleas No. 1 which had decided the earlier escheat action. Consequently, the Commonwealth's suit to set aside the trust should have been instituted in the orphans' court and that court properly ignored the pending common pleas action.

Since we conclude, independently of the Orphans' Court Act of 1951,[8] that the orphans' court properly commenced a determination of the petition for sale, we need not decide appellees' further contention that the exclusive jurisdiction conferred by that Act over the "administration and distribution" of inter vivos

---

[7] Since 1951, accounts have been filed, agreements of trustees approved, trustees removed, and trustees ad litem appointed by the orphans' court.

[8] Act of August 10, 1951, P. L. 1163, art. III, §301(3), as amended by the Act of February 10, 1956, P. L. (1955) 1022, 20 P.S. §2080.301(3).

trusts includes questions involving the initial validity of the trust.

The second question raised in this appeal is whether the court below acted properly in rejecting the Fleisher-Pearlstine offer. In this regard, appellants raise two objections: (1) that the orphans' court incorrectly evaluated the Fleisher-Pearlstine offer; and (2) that the Act of May 24, 1945 prevents a court from rejecting a contract made by a fiduciary because of the presence of higher offers.[9]

Preliminarily, we should point out that we have grave doubts whether the propriety of the court's action with respect to the Fleisher-Pearlstine offer is properly before us since the offerors have not prosecuted an appeal. However, we prefer to affirm the court below on the merits of the matter.

In disputing the lower court's evaluation of the Fleisher-Pearlstine offer, appellants argue that the "put" agreement is worth far in excess of the $350,000 placed upon it by the orphans' court. After reviewing the substantial amount of evidence presented before the court below as to the value of this speculative item, we cannot say that the orphans' court acted unreasonably or without sufficient evidence in concluding that the guaranteed $350,000 was the top value which should be placed on the "put" arrangement.

Also, the Act of May 24, 1945 did not prevent the court below from considering the possibility of higher offers for the Dougherty stock. That Act, which was passed to protect persons purchasing from fiduciaries, specifically excludes from its coverage "contracts . . .

---

[9] "When a fiduciary shall hereafter make a contract not requiring approval of court, or when the court shall hereafter approve a contract of a fiduciary requiring approval of court, . . . the receipt of an offer to deal on other terms . . . shall [not] constitute ground for any court to set aside the contract. . . ." P. L. 944, §1, 20 P.S. §818.

requiring the approval of the court," as this one did. In such a situation the purchaser should realize that the judgment of the orphans' court having been invoked, that court must consider the best interests of the trust, including the possibility of higher offers for the trust property. See *Stone Estate,* 358 Pa. 335, 56 A. 2d 664 (1948).

Appellants next contend that the power of the court below was limited to approval or disapproval of the petition for acceptance of the Fleisher-Pearlstine offer and that it had no power to order a public sale of the Dougherty stock. Since three of the four trustees approve of a public sale of the trust asset, this argument assumes that unanimous agreement of the trustees was required by the settlor in this matter. We do not so construe the deed of trust.

An examination of the trust instrument reveals that the first paragraph of the section dealing with the powers of the trustees refers to the important power of investing and re-investing in trust property. Here the settlor explicitly stated that the decision of a majority of trustees should govern. In the following paragraphs of this section other powers of the trustees are spelled out, many of them redundant and none of them mentioning explicitly the vote required for exercise of that particular power. In the paragraph relating to the sale of trust assets, settlor stated that the power should be exercised "as to my 'trustees' may seem proper."

Appellants stress the word "my". They argue that the settlor used that word in contrast to the earlier declaration of majority rule to indicate the requirement of unanimity. Such a construction, however, would lead to the anomalous result that a majority of trustees could decide to invest in trust property but, in order to sell trust assets to raise the capital necessary for the investment, the consensus of all the trustees would be required. In addition, such a construc-

tion would seem to conflict with the settlor's clear purpose of granting to the trustees great freedom and flexibility of action. We conclude, therefore, that the settlor intended the initial statement of majority rule to apply to all the trust powers.

Since we hold that the requisite number of trustees desired a public sale of the Dougherty stock,[10] we need not decide whether the court below could order such a sale absent such approval and without formally removing the dissenting trustee.

The fourth question before us is whether the court below had the power to order a sale of the Dougherty stock without the consent of the Commonwealth. On this point, the Commonwealth claims that under the agreement entered into by it with the trustees, it had an absolute veto power over the sale of the stock so long as any indebtedness remained. It is true that paragraph three of this agreement might admit of such an absolute power. Paragraph two of the agreement, however, states that the trustees may convey trust assets where "ordered and directed by the final judgment or decree of a court of competent jurisdiction." We would interpret this paragraph as permitting a court of competent jurisdiction to order a sale without the Commonwealth's consent where it determined that the sale would not prejudice the rights of the Commonwealth vis-a-vis the trust. Clauses of a contract, such as paragraphs two and three, which seem to conflict will be construed, if possible, as consistent with one another. See 3 Corbin, Contracts §547 (1960). Consequently, we interpret the agreement as providing alternative methods in regard to the sale of trust assets, i.e., obtaining *either* the consent of the Common-

---

[10] It cannot seriously be argued that the decision to sell was an abuse of the discretion conferred upon the trustees by the settlor. See Restatement (2d), Trusts, §187 (1957).

wealth *or* the approval of a court of competent jurisdiction.

Moreover, even if the construction urged by the Commonwealth were adopted, the mere presence of a legal right to prevent a sale does not force a court of equity to enjoin a sale where the legal right is otherwise protected. See *Plymouth Woods Corporation v. Maxwell,* 407 Pa. 539, 181 A. 2d 321 (1962); *Moyerman v. Glanzberg,* 391 Pa. 387, 138 A. 2d 681 (1958). The legal rights of the Commonwealth seem adequately protected by the decree below since the proceeds of the sale should be more than adequate to pay the claims of all possible creditors. We conclude, therefore, that the court below did have the power to order a sale of the stock without the Commonwealth's consent.[11]

The final question before us is whether it was proper for the court below to dispense with the need for obtaining a release from the Commonwealth after advertising that sale was conditioned on obtaining such release. Here we believe the lower court committed its sole error. In the first place, this change in the "rules of the game" was unfair to potential bidders. More importantly, however, the presence of the release provision surely deterred higher bids and hence prevented the court from obtaining its objective of securing the best possible price for the Dougherty stock. For example, the intervening appellant alleges that he would offer $1,600,000 for the stock absent this condition of sale. Since, as pointed out above, a release is unnecessary to protect the interests of the Commonwealth, we conclude that another public sale[12] should take place absent this provision.

---

[11] It has also been suggested that such a broad restriction on alienation would be void as against public policy.

[12] Appellants have suggested that open bidding would bring higher offers for the stock than sealed bids. We direct this observation to the discretion and judgment of the court below.

436

Decree reversed and new sale ordered in conformity with this opinion. Costs to be paid out of proceeds of sale.

Mr. Chief Justice BELL dissents.