## Binenstock Trust

Before Klein, P. J., Bolger, Lefever, Saylor, Shoyer and Burke, JJ.

*Benjamin R. Neilson, H. Ober Hess, Mortin E. Rotman, George F. Shinehouse, Jr.* and *Saul, Ewing, Remick & Saul*, for exceptants.

*Fox, Rothschild, O'Brien & Frankel,* and *Irvin Stander*, guardian and trustee ad litem, contra.

SHOYER, J., March 11, 1966.—The exceptions are concerned exclusively with the complaints of certain of the trustees and counsel, who are disappointed with the reduced amounts of compensation allowed them by the learned auditing judge.

Joseph Binenstock, settlor, created this trust by conveyance of all the stock of J. A. Dougherty's Sons, Inc., Distillers (Dougherty) to himself and seven other trustees on August 29, 1947, for the benefit of his four daughters as life tenants, with remainder to their issue. The trust has had a turbulent and litigious history as reported in Commonwealth by Truscott v. Binenstock, 366 Pa. 519 (1951), Binenstock Trust, 28 D. & C. 2d 296 (1962), and Binenstock Trust, 410 Pa. 425 (1963). With the sale of the Dougherty stock to Publicker Company a second time on June 26, 1963, for $2,178,000, it became possible to satisfy the outstanding claims of the United States Government and the Commonwealth, and a more tranquil existence for the duration of the trust is now in prospect.

Settlor died on March 12, 1952. Of the surviving trustees, Girard Trust Bank (called Girard Trust Company in the deed), John Tait, an accountant, Albert Barnes Zink, Esq., and settlor's four daughters continued to serve. In 1961, three of the daughters resigned. Their sister, Mrs. Jacobs, whose husband, Allen, was employed from 1951 to 1962 as president of Dougherty at a salary of $30,000 a year, remained a trustee. At the audit, all individual trustees agreed to resign. They also asked payment of terminal commissions as well as compensation for extraordinary services to the trust.

The claims for compensation which were submitted by seven trustees and seven counsel exceeded $660,000. The learned auditing judge distributed $102,305.97 ($371,461.97 asked) among the trustees, and allowed $159,500 ($288,900 asked) to six of the seven counsel. With so many hands reaching for plums, the auditing judge was forced to rely on the objections raised (almost unassisted) by Irvin Stander, Esq., the guardian-trustee ad litem, for the court cannot reduce counsel fees and commissions solely on its own motion: Stitzel's

Estate, 221 Pa. 227, 230. Mr. Stander entered the case as guardian-trustee ad litem when Lester J. Schaffer, Esq., resigned after a conflict developed between the interests of the Jacobs minors and his other wards.

Exceptions to the reduced allowances made by the court have been filed specifically by Lester J. Schaffer, Esq., who for the above-stated reasons resigned as guardian-trustee ad litem prior to the audit; by Harry Shapiro, Esq., for additional counsel fees, and by Messrs. Zink and Tait for additional extraordinary compensation as trustees. Following oral argument before the court en banc, Mr. Schaffer withdrew his exceptions.

As we consider the subject of counsel fees, we cite the views of our President Judge Klein, who, speaking from his long judicial tenure and wealth of experience in orphans' court matters, has said: "There are no certain or scientific rules to govern the determination of disputed counsel fees. Each is sui generis and dependent upon many factors and circumstances. Broad basic principles have been enunciated to assist judges in arriving at fees which are fair to attorney and client, alike, but it is much easier to state the rule than to apply it": Grier Estate (No. 2), 31 D. & C. 2d 66, 71.

Probably no explicit recognition of this vexing problem by our Supreme Court has been more frequently quoted than that of Good's Estate, 150 Pa. 307, 310: "The amount of fees to be allowed to counsel, always a subject of delicacy if not difficulty, is one peculiarly within the discretion of the court of first instance. Its opportunities of judging the exact amount of labor, skill and responsibility involved, as well as its knowledge of the rate of professional compensation usual at the time and place, are necessarily greater than ours, and its judgment should not be interfered with except for plain error". These remarks of Chief

(then Mr. Justice) Mitchell have been cited and relied on in Vandergrift Estate, 406 Pa. 14, 34; Bickel Appeal, 388 Pa. 270, 276; Berkowitz's Estate (No. 2), 344 Pa. 485, 486; Davidson's Estate, 334 Pa. 389, 395; Harton's Estate, 331 Pa. 507, 523; and Rambo's Estate, 327 Pa. 258, 266. See also Williamson Estate, 368 Pa. 343, 355; Lare Estate, 368 Pa. 570, 576; and Strickler Estate, 354 Pa. 276, 277.

We have carefully considered Mr. Shapiro's demand that $100,000 is due him for "special" services, and reviewed the record of his participation in the affairs of this trust. As counsel for one of the trustees, Mrs. Jacobs, he was allowed his requested fee of $10,000. His claim for a much larger "special fee" for having created the fund of $2,178,000 rests on the principle recognized in some of our cases. See Wilbur's Estate, 334 Pa. 45; Hempstead v. Meadville Theological School, 286 Pa. 493, 495; contra, Harrison's Estate, 221 Pa. 508. Allowance, however, is always dependent upon existence of the following equitable requirements, that: (a) the services were designed to, and clearly did create the fund; (b) the services for which fees are claimed were necessary; and (c) the fund is created through litigation where the causal connection between its creation and the services rendered is direct and not merely tangential or incidental. See Restatement, Restitution, §105 (2) and Comment g; Peoples-Pittsburgh Trust Company v. Pittsburgh United Corporation, 334 Pa. 107, and the above-cited cases.

In his petition, Mr. Shapiro averred that the basis of his claim was the gain in the sales price of almost $800,000 with "no thanks to the trustees Girard, Zink or Tait; but due solely to the work and efforts of the" claimant's office. Since the opinions of his three experts rested largely on this self-asserted appraisal, their combined testimony collapsed against the opposing and contradictory bulwark of the record: Sparks's Estate,

127 Pa. Superior Ct. 364, 381, affirmed 328 Pa. 384.

After Publicker had bested the Fleisher-Pearlstine group by sealed bids in a court approved sale, Mr. Shapiro was retained by Mrs. Jacobs in April 1962 to have the sale set aside. Although Mrs. Jacobs had joined with the three other trustees in approving the Fleisher-Pearlstine agreement for a sale at $1,250,000 (which would have provided her husband with continued employment as a company officer), she now, through her counsel, Mr. Shapiro, contended (1) that under the Act of May 24, 1945, P. L. 944, 20 PS §818 (the fiduciary binding contract statute), the Fleisher-Pearlstine sale was binding on the trustees and the trust, and (2) that consummation of the Publicker sale for $1,411,000 would destroy the trust by providing no more than enough to satisfy creditors.

Pending the appeal to the Supreme Court, which was initiated by the Commonwealth (and sustained solely on an issue raised by the Commonwealth, although Mrs. Jacobs and her son, a remainderman, had joined in the appeal), the Barton offer of $1,461,000 and the Shankin offer of $1,600,000 were obtained and recommended by Mrs. Jacobs and Mr. Shapiro. Both offers were rejected by the other trustees, on the ground that the legal status of the Publicker sale was not yet resolved. *Thereupon, Mr. Shapiro petitioned this court to remove the Girard as a trustee, and vigorously and ominously threatened all three nonfamily trustees with surcharge.*

On the resale ordered by the Supreme Court, Publicker again was the successful bidder. This sale was at auction. It was highlighted by the fact that during the fiscal year just ended, net income under the management of Mr. McCabe, who had replaced Mr. Jacobs as the active head of Dougherty, had risen from $161,-000 to $396,000, an increase of 145 percent. This information was made available to all prospective

bidders. The learned auditing judge found as a fact that the higher price of $2,178,000 (an increase of $767,000) was attributable *solely* to the efficient management provided by Mr. McCabe in enhancing the company's net income.

In addition to the foregoing resume of incontrovertible record facts, all claimants agreed at the audit that "the income is a material influence on the price that would be received". The correctness of the above finding by the learned auditing judge is inescapable, and we have no alternative but to affirm the same.

It should be noted that Nathan L. Posner, Esq., who entered the case on behalf of two of Mrs. Jacobs' sisters for the sole purpose of opposing the Fleisher-Pearlstine agreement as too low, also claimed compensation for creation of the fund. Not only was he successful in opposing the sale at $1,250,000 after its approval by all four trustees, but thereafter his continued participation in the litigation was manifestly for the benefit of the trust as a whole, rather than any particular branch of the family. His request for a fee of $12,500 was allowed without opposition. One may logically ask: Why isn't his claim entitled to even more consideration than that of Mr. Shapiro, inasmuch as he was the first to take active steps to increase the fund, which was then lower by $161,000 than the figure at which Mr. Shapiro started?

Actually, the only increase for which Mr. Shapiro could possibly receive credit would be from $1,411,000 to $1,600,000 (the Shankin offer); viz., $189,000, which would never support a claim for a $100,000 fee. Even the $189,000 figure could not be accepted as net gain. When a claim for counsel fee rests on the amount of gain to a fund, there must be deducted from the gross recovery "the impact of federal income taxes, costs and the enumerated expenses": Williams Estate, 415 Pa. 273, 275. Here, after satisfaction of the

Commonwealth claim and the Federal liens, the trustees paid a capital gains tax of $222,197.

*The glaring truth is that all gain over $1,600,000 (the Shankin offer) was purely fortuitous, so far as Mr. Shapiro is concerned.* Indeed, it is just as fortuitous as the luck of a farmer hunting water with a dowser who strikes oil. Perhaps Allen Jacobs, who claimed sole knowledge of a hidden $1,000,000 in the inventory, suspected the increase that efficient management of Dougherty could accomplish as to net profits, but there is no evidence that Mr. Shapiro knew this or had reason to anticipate Mr. McCabe's success. *The learned auditing judge, relying chiefly on the uncontradicted testimony of both Mr. and Mrs. Jacobs, found as a fact that they were motivated solely to secure the husband's continued employment, and not to obtain the highest price for the trust property. Other evidence in the record supports this finding and we affirm it without hesitation.* Unfortunately too, for Mr. Shapiro, so far as the trust is concerned, this finding of fact tarnishes all his efforts with the conflicting interests and the selfish and ill concealed purposes of his client.

We find no analogy to Obici Estate (unreported), O. C. Lackawanna County, no. 1197 of 1948, relied on by claimant. The fund there was $12,000,000, and counsel fees requested of $300,000 were allowed only in the aggregate of $137,000. Furthermore, attorneys for the dissenting majority trustees, to whose claim Mr. Shapiro likens his own, were solely and exclusively responsible for the increase.

The learned auditing judge has adopted the recommendation of the guardian-trustee ad litem that Mr. Shapiro's claim for "special fee" should be allowed in the amount of $30,000. We see no reason to increase this figure. A majority of this court considers it to be more than generous. Since no one is requesting its re-

duction, however, we shall not disturb it. Mr. Shapiro's exceptions are accordingly dismissed.

Messrs. Zink and Tait served as trustees from creation of the trust in 1947. At the audit, they were allowed terminal commissions at the rate of three and one-half percent on the entire corpus apportioned among the six individual trustees, or $10,814 to each exceptant. In addition, Mr. Tait was given $3,000 for extraordinary services, and Mr. Zink $5,000, the same amount, viz., $15,814, as awarded Mrs. Jacobs. Before the court en banc, counsel for these two nonfamily trustees presented most persuasive arguments orally and in briefs. As testified by Girard's trust officer, Mr. Woerner, the Binenstock trust was harassed with a "series of crises" starting in March 1951. Commencing with the Commonwealth's escheat j u d g m e n t against settlor, and their ensuing threat to set the trust aside as fraudulent, followed by the Federal claim for income taxes, liens, levies and warrants of distraint against Binenstock and Dougherty, the corporation, by December of 1951, was completely paralyzed, and the trustees began negotiations to free its assets. Crippling income tax judgments were litigated to the circuit court of appeals. When the government insisted that Binenstock be removed as head of Dougherty, the trustees were responsible for his replacement with Allen Jacobs, husband of the daughter trustee. When Jacobs resigned abruptly after the first sale to Publicker, the trustees had the responsibility of replacing him. Only when every avenue of credit was exhausted did the four remaining trustees decide to sell the corporation. The first sale to Publicker created opposition from the remaining family trustee, and through her counsel she vigorously threatened the others with surcharge. The hearings which were held in connection with Mrs. Jacobs' efforts to nullify the Publicker sale disclosed a picture of virtual insolvency.

All these problems required innumerable decisions not encountered in the management of the usual trust estate. Mr. Zink, but not Mr. Tait, was a Dougherty director. It was customary for all trustees to meet jointly with the directors. Both Mr. Zink and Mr. Tait participated in all Girard's conferences and decisions. Meanwhile, the nonfamily trustees were deprived of income commissions as provided in settlor's fee agreement, because Dougherty's profits were siphoned to hold off first the Commonwealth and later the Federal government: Lafferty's Estate, 184 Pa. 502. Finally, the trustees, in September 1963, negotiated a reduction of the Commonwealth's claim from $486,000 to $300,000. The end result was salvage of a net liquid trust fund of close to $1,200,000 before the making of awards to trustees and counsel. Equity rewards a successful result achieved in the face of such adverse circumstances with extra compensation over and above the usual rate of commission: McCaskey's Estate, 307 Pa. 172, 179-82.

At the suggestion of the learned auditing judge, in which we all concur, his awards for "special" services for Messrs. Zink and Tait will be increased respectively $10,000 and $12,000, so that total compensation to each will be $25,814. To this extent, their exceptions are sustained and the adjudication modified.

We believe that the method used by the learned auditing judge in arriving at a figure of $10,814 as terminal commission for each of the three individual trustees, who continued to serve until the audit, was fair and equitable, inasmuch as the trust still continues, and eventually Girard must be awarded terminal compensation. For their ordinary duties, the three and one-half percent rate allowed Mr. Tait and the others is "reasonable and just" compensation: Act of June 14, 1836, P. L. 628, sec. 29, 20 PS §3271. Mr. Tait's exception to the amount of his terminal commission is, therefore, dismissed.

Except for the modification at the instance of the learned auditing judge as set forth above, all exceptions are dismissed, and the adjudication is confirmed absolutely.