James TROMBETTA, Tara Trombetta Witover and Julie Trombetta Gray, Appellants,

v.

RAYMOND JAMES FINANCIAL SERVICES, INC., Raymond James & Associates, Inc., Peter Gialames and Edward Lewis,

v.

Neil M. Niren, M.D., and James A. Trombetta,

James Trombetta, Tara Trombetta Witover and Julie Trombetta Gray,

v.

Raymond James Financial Services, Inc., Raymond James & Associates, Inc., Peter Gialames and Edward Lewis, Appellees,

v.

Neil M. Niren, M.D., and James A. Trombetta,

Appeal of: Raymond James Financial Services, Inc., Raymond James & Associates, Inc. and Edward Lewis.

Superior Court of Pennsylvania.

Argued April 19, 2006.
Filed Aug. 22, 2006.

**554**

Kerrin M. Kowach, Pittsburgh, for Trombetta.

David C. Franceski, Philadelphia, for Lewis.

Richard B. Tucker, III, Pittsburgh, for Niren.

BEFORE: DEL SOLE, P.J.E., TAMILIA and JOHNSON, JJ.

OPINION BY TAMILIA, J.:

¶ 1 James Trombetta and his daughters Tara Trombetta Witover and Julie Trombetta Gray appeal from the March 4, 2005 Order denying appellants' request for *de novo* review of an unfavorable decision rendered by a three-member National Association of Securities Dealers arbitration panel ("NASD arbitration panel").

¶ 2 Raymond James Financial Services, Inc., Raymond James & Associates, Inc., Peter Gialames, and Edward Lewis cross-appeal from the Order ruling that the parties were governed by a *de novo* review arbitration clause in an agreement between the parties.[1]

¶ 3 In May of 1998, appellant James Trombetta transferred brokerage accounts held in joint tenancy by him and his daughters to Raymond James. Peter Gialames, a long time friend of Trombetta's[2] and the branch manager of the Allegheny County office of Raymond James, became appellants' broker on these accounts. Upon transfer, appellants moved $1.36 million in mutual fund investments into Account Number 85178329 ("Main Account"), signing an agreement to that effect ("Client Agreement"). The Main Account was held in joint tenancy by the three appellants.

¶ 4 In the spring of 1999, Mr. Trombetta attended an appointment with his derma-

---

1. For the sake of clarity, we will refer to Raymond James Financial, Inc., and Raymond James & Associates, Inc., collectively as "Raymond James".

2. References to "Trombetta" refer to James Trombetta.

tologist, appellee Dr. Neil Niren, M.D. During the appointment, Trombetta and Niren had a discussion about Niren's investment strategy—which was comprised mostly of investing in high-growth technology stocks and naked put option trading. N.T., Arbitration Hearing, Vol. I, 9/22/03, at 148–153. Shortly after this discussion, Trombetta requested Niren meet with him and Gialames to discuss Niren's investment strategy. *Id.* at 150. Following this meeting, Trombetta instructed Gialames to open an option account for the purpose of implementing Niren's strategy. *Id.* at 444. Pursuant to internal operating procedures, however, Raymond James rejected a proposed agreement to create an option account for appellants because Trombetta had no prior experience with option trading. *Id.* at 303. Subsequent to this rejection, Gialames devised a strategy whereby he would draft a second proposed agreement to create an option account listing Trombetta and Niren as joint account holders, thereby satisfying the Raymond James requirement that an option account holder have option trading experience. *Id.* at 169–170. Pursuant to this strategy, Gialames executed the second proposed agreement ("Option Agreement"). In April of 1999, Raymond James accepted the agreement, and an option trading account ("Option Account") was opened listing Trombetta and Niren as tenants-in-common.

¶ 5 Subsequent to the opening of the Option Account, Trombetta commenced trading options. Trombetta would call Niren to learn which options he was trading; he would then relay this information to Gialames who, in turn, would contact Niren for instructions on how to execute specific option trades. N.T., Arbitration Hearing, Vol. VII, 4/6/03, at 1572. During this interval of time, Gialames brought in broker Edward Lewis for assistance in servicing the Main Account and the Option Account.

¶ 6 From April of 1999 through March of 2000, appellants utilized Niren's strategy and enjoyed high profits. The Option Account alone had a cumulative gain of $264,981 during that time period. *Id.* at 1738. Trombetta utilized the collateral value of securities held in the Main Account to fund his option trading. N.T., Arbitration Hearing, Vol. I, 9/22/03, at 226–229. In March of 2000, the stock market began a historical decline. An expert testified, however, that the Main Account remained profitable through August of 2000 and the Option Account remained profitable through January of 2001. N.T., Arbitration Hearing, Vol. VII, 4/7/03, at 1739, 1744. After sustaining substantial losses to both accounts during the following months, appellants transferred the remaining securities in both the Main Account and the Option Account to Merrill Lynch. *Id.* at 2134–2135.

¶ 7 On December 3, 2001, appellants commenced this litigation by filing a Statement of Claim with the National Association of Securities Dealers ("NASD") against Raymond James, Peter Gialames, and Edward Lewis. The claim raised causes of action for breach of fiduciary duty, fraud, misrepresentation, negligence, gross negligence, and failure to supervise in connection with various stock transactions, investments on the margins, and option trades. Appellants sought $2 million in compensatory damages coupled with $2 million in punitive damages.

¶ 8 On February 11, 2002, Raymond James, Gialames, and Lewis answered by denying all material allegations and raising the defenses of waiver, estoppel and laches, authorization/ratification, failure to mitigate, statute of limitations, and assumption of risk. They also issued a Joinder Statement of Claim, dated January 14,

2003, which raised a claim for contribution and indemnification against Niren.

¶ 9 In turn, on February 28, 2003, Niren answered by denying the Raymond James allegations. He also filed a Counter Statement of Claims for abuse of process against Raymond James and causes of action for contribution and indemnification against both Gialames and Lewis.

¶ 10 On November 25, 2003, Raymond James, Gialames, and Lewis filed an Amended Joinder Statement of Claims asserting a counter-claim against Trombetta for contribution and indemnification.[3]

¶ 11 The NASD arbitration panel conducted a hearing spanning nine days from the fall of 2003 until the spring of 2004. On June 14, 2004, the NASD arbitrators issued an award denying all of the parties' claims, counter-claims, and third-party claims in their entirety. The NASD panel, however, did not issue a written memorandum outlining their rationale for denying these claims.

¶ 12 On July 13, 2004, appellants filed a petition for vacatur in the Court of Common Pleas of Allegheny County. On August 17, 2004, Raymond James and Lewis filed a joint cross-petition to add Niren and Trombetta as co-respondents. They also sought confirmation of the NASD panel's ruling. By Order of September 17, 2004, the Honorable Stanton Wettick granted a motion filed by Raymond James and Lewis requesting the litigation be designated as complex.

¶ 13 At oral argument on November 16, 2004, appellants asserted the Client Agreement they had signed before originally transferring their account to Raymond

James in May of 1998 provided they were entitled to factual and legal *de novo* review of the NASD arbitration panel ruling. In support of this assertion, appellants pointed to the following passage in the Client Agreement:

> A court of competent jurisdiction may enter judgment based on the award rendered by the arbitrators. We agree that both parties will have a right to appeal the decision of the arbitrators if the arbitrators award damages that exceed $100,000; the arbitrators do not award damages and the amount of my loss of principal exceeds $100,000; or the arbitrators award punitive damages. *In each of the foregoing cases, a court having jurisdiction shall conduct a "de novo" review of the transcript and exhibits of the arbitration hearing.*

Record, No. 7, Petition for Rule to Show Cause Why *De Novo* Review of Arbitration Award Should Not Be Granted or, in the Alternative, Why Arbitration Award Should Not Be Vacated, Exhibit B, Client Agreement (emphasis added).

¶ 14 On March 4, 2005, the court below issued an Order and Opinion denying *de novo* review. On June 28, 2005 a second Order and Opinion denying appellants' petition for vacatur and granting cross-appellants' petition were issued, thereby confirming the NASD panel's decision. In doing so, the court utilized a "manifest disregard for the law" standard of review and cited as authority *GMS Group, LLC v. Benderson*, 326 F.3d 75 (2d Cir.2003), for the proposition that the "manifest disregard for the law" standard was appropriate for reviewing arbitration awards with-

---

**3.** Appellants argued at arbitration that even if Trombetta was not entitled to damages, his daughters Tara Trombetta Witover and Julie Trombetta Gray were. Cross-appellants, therefore, filed a counter-claim against Trombetta in the event the arbitrators found the daughters were entitled to compensation based on the theory that Trombetta was contributorily negligent in the handling of the assets held by the three appellants in the two accounts at issue. Appellees' brief at 11.

out accompanying written opinions under the Federal Arbitration Act.[4]

¶ 15 On July 19, 2005, appellants filed a notice of appeal with this Court and on August 2, 2005, Raymond James and Lewis filed a notice of cross-appeal. Appellants raise one complex and novel issue for our review:

Is an agreement between parties that disputes between them will be resolved by arbitration and that, in the event of certain decisions of the arbitrators, either party is entitled to seek a *de novo* review by a court of the transcript and exhibits of the arbitration hearing enforceable?

Appellants' brief at 5.

¶ 16 This issue presents our Court with two questions of first impression in the Commonwealth. First, we must decide whether standards of review outlined in the Federal Arbitration Act ("FAA") preempt the standards of review outlined in the Pennsylvania Arbitration Act, thereby binding us by federal judicial interpretation of the FAA standards. Second, if we conclude state law applies, we are required to resolve whether an arbitration clause providing for *de novo* review by the trial court of an arbitration award is enforceable as a matter of law.

¶ 17 Accordingly, we must consider three sets of issues. After establishing whether the *de novo* review clause contained in the Client Agreement governs the conduct between the parties, we must ascertain whether the dispute at hand is governed by the Federal Arbitration Act or the Pennsylvania Uniform Arbitration Act and, regardless of our conclusion, whether federal or Pennsylvania standards of review govern this dispute. We must then settle the question of whether a contract providing for *de novo* review of an

arbitration award by a trial court is enforceable.

## I. Does the Clause Providing for *De Novo* Review in the Client Agreement Govern as a Matter of Contract Law?

¶ 18 Cross-appellants Raymond James, Gialames, and Lewis raise four properly preserved challenges in their cross-appeal to the court's conclusion that the *de novo* review clause governed the parties' conduct. First, cross-appellants argue the *de novo* review clause in the Client Agreement was modified and, hence, the clause was inapplicable when appellants initiated arbitration. Second, they contend the language of the Option Agreement controls the parties' agreement, not the Client Agreement, and because the Option Agreement does not provide for *de novo* review the clause does not govern. Third, cross-appellants allege appellants failed to establish the existence of the Client Agreement. Finally, cross-appellants maintain the Client Agreement itself is ambiguous as to what standard of review the parties agreed upon.

¶ 19 In support of their first argument, cross-appellants assert the *de novo* review clause was modified in December of 2000 after Raymond James was instructed by the New York Stock Exchange ("NYSE") to remove the clause from their client agreements. Cross-appellants claim the modification was executed through a newsletter sent to all Raymond James investors in the Winter of 2000 which stated:

Raymond James has recently simplified the arbitration language contained in our Client Agreement in an effort to make it easier for our clients to understand.

---

4. 9 U.S.C. § 1 *et seq.*

Because current clients will not be exposed to this new language unless they open another account with Raymond James, we wanted to take this opportunity to share this change with you.

Effective January 1, 2001, the Arbitration Agreement, which is contained in the Client Account Agreement, will read as follows:

. . .

(c) A court of competent jurisdiction may enter judgment based on the award rendered by the arbitrators.

Record, No. 7, Cross–Petition for Rule to Show Cause, Exhibit 5, *Investment Briefings*, p. 5.

¶ 20 Cross-appellants argue this notice was sufficient to facilitate modification pursuant to a provision contained in the Client Agreement permitting "automatic modification" if provisions of the Client Agreement proved to run afoul of NYSE customs and regulations. *Id.* at Exhibit 3, Client Agreement.[5] Cross-appellants maintain that if Raymond James had intended the change to apply to new accounts only, then further notification would have been superfluous because existing clients who opened new accounts would have seen this language in their new Client Agreements. Consequently, they assert the newsletter functioned to retroactively modify existing Client Agreements such as the one appellants signed.

¶ 21 The court below dismissed cross-appellants' modification theory and cited two reasons for doing so. First, the court concluded the newsletter did not provide adequate notice of modification in that it was misleading because it stated "Raymond James has recently simplified the arbitration language contained in our Client Agreement," but failed to mention modification of the Client Agreement terms. Second, it concluded the newsletter indicated the new arbitration language would not apply unless a client opened a new account. Trial Court Opinion, Wettick, J., 3/4/05, at 8–9.

¶ 22 Our standard for reviewing factual findings is to determine whether they are supported by the record. The interpretation of a contract poses a question of law subject to plenary review. *Tuscarora Wayne Mut. Ins. v. Kadlubosky*, 889 A.2d 557, 560 (Pa.Super.2005) (citations omitted). The burden of proving modification of a contract is carried by the party asserting the modification. *East Texas Motor Freight Diamond Div. v. Lloyd*, 335 Pa.Super. 464, 484 A.2d 797, 800 (1984), *citing In re Indus. Car. Mfg. Co.*, 1 B.R. 339 (Bkrtcy.E.D.Pa.1979), *Nicolella v. Palmer*, 432 Pa. 502, 248 A.2d 20 (1968). A contract can be modified with the assent of both contracting parties if the modification is supported by consideration. *Wilcox v. Regester*, 417 Pa. 475, 482, 207 A.2d 817, 821 (1965), *citing Pellegrene v. Luther*, 403 Pa. 212, 215, 169 A.2d 298, 299 (1961), *Stoner v. Sley System Garages*, 353 Pa. 532, 533–534, 46 A.2d 172, 173 (1946). Modification of a contract may be demonstrated by words, conduct, or both. *Burge v. Western Pennsylvania Higher Educ. Council, Inc.*, 391 Pa.Super. 108, 570 A.2d 536, 538 (1990) (citations omitted). Further, when an ambiguity in a contract exists, courts are free to con-

---

**5.** Cross-appellants emphasize NYSE rules are approved by the Securities and Exchange Commission ("SEC") and, pursuant to United States Supreme Court mandate, NYSE rules carry the same mandate as SEC rules. Appellees' brief at 28. This emphasis is misplaced as the question of whether modification occurred depends upon whether modification was conducted properly as a matter of state law, not whether it was conducted in accord with NYSE rules.

strue the contract against the drafter and consider extrinsic evidence in so doing. *In re Estate of Blumenthal,* 812 A.2d 1279, 1286 (Pa.Super.2002) (citation omitted).

 ¶ 23 After careful review of the newsletter cross-appellants argue modified the Client Agreement, we conclude the court below was correct in finding modification had not taken place by the time arbitration commenced such that the *de novo* review clause was eliminated from the parties' agreement. Nothing on the face of the newsletter alludes to modification; in fact, the statement that the Client Agreement *language* was simplified could easily lead to the inverse conclusion, i.e., the changes had no substantive effect on existing or future Client Agreements at all. Additionally, nothing in the newsletter refers to a change in NYSE rules or regulations, an event that would trigger the alleged right to automatic modification. Moreover, a modification must be agreed to by both parties. *Wilcox, supra* at 482, 207 A.2d at 821. There is no evidence appellants read the newsletter; it is clear they did not respond to the newsletter. It would be stretching the bounds of contract principles to find a lawful modification under these circumstances.

¶ 24 A plain reading of the newsletter, drafted by Raymond James' Senior Vice President and corporate counsel, substantiates the court's conclusion as well. The newsletter states in relevant part:

> *Effective January 1, 2001,* the Arbitration Agreement, which is contained in the Client Account Agreement, *will* read as follows:
>
> . . .
>
> (c) A court of competent jurisdiction may enter judgment based on the award rendered by the arbitrators.

Record, No. 7, Cross–Petition for Rule to Show Cause, Exhibit 5, *Investment Briefings,* p. 5 (emphasis added). Nothing in this passage indicates the impending change is to function retroactively as to already existing agreements. The newsletter states the Arbitration Agreement "will" read. It is difficult to read the word "will" in this context as encompassing a change in the language of existing Client Agreements without further proof of such an intention.

¶ 25 The newsletter also states existing clients will not be "exposed to" the new arbitration language unless they open a new account. The phrase "exposed to" preceded by the words "current clients" ("current clients will not be exposed to this new language unless they open another account . . . .") indicates clients would only be subject to the new language when and if they opened a new account. We conclude, therefore, the newsletter did not modify the existing Client Agreement or, more precisely, did not eliminate the *de novo* review clause in the Client Agreement.

 ¶ 26 We now turn to cross-appellants' second argument with respect to why the *de novo* review clause does not control—namely, that the Option Agreement language governs the conduct of the parties because the Option Agreement is more specific than the Client Agreement.

¶ 27 The court below found the Option Agreement incorporated the terms of the Client Agreement by reference, including the provision for *de novo* review. It concluded, therefore, the *de novo* review clause governed the conduct of the parties but failed to set forth a clear rationale for finding the clause took precedence over the "strictly limited" review language contained in the Option Agreement. Trial Court Opinion, 3/4/05, at 9.

¶ 28 Cross-appellants do not dispute the court's conclusion that the Option Agreement incorporated the Client Agreement by reference. They also recognize these documents must be read together. Cross-appellants aver the "strictly limited" review of an arbitration award set forth in the Option Agreement takes precedence over the *de novo* review clause because the "strictly limited" standard is more specific due to the fact it is contained in the Option Agreement, which directly controls the options trades that allegedly constitute the gravamen of appellants' causes of action.

¶ 29 It is a general rule of law in the Commonwealth that where a contract refers to and incorporates the provisions of another, both shall be construed together. *Shehadi v. Northeastern Nat'l. Bank,* 474 Pa. 232, 236, 378 A.2d 304, 306 (1977) (citations omitted). It is well-settled that clauses in a contract should not be read as independent agreements thrown together without consideration of their combined effects. *Brown v. Cooke,* 707 A.2d 231, 233 (Pa.Super.1998), *quoting In re Binenstock's Trust,* 410 Pa. 425, 190 A.2d 288 (1963). Terms in one section of the contract, therefore, should never be interpreted in a manner which nullifies other terms in the same agreement. *Id.* Furthermore, the specific controls the general when interpreting a contract. *Baltic Dev. Co. v. Jiffy Enterprises, Inc.,* 435 Pa. 411, 416, 257 A.2d 541, 543 (1969), *citing Minnotte Appeal,* 411 Pa. 492, 192 A.2d 394 (1963). As previously mentioned, the interpretation of a contract poses a question of law subject to plenary review. *Tuscarora Wayne Mut. Ins., supra* at 560.

¶ 30 There is no question the Option Agreement explicitly incorporates all of the provisions of the Client Agreement. As precedent demands, we will consider the arbitration provisions in the Client Agreement and the Option Agreement together in an attempt to ensure neither provision nullifies the other. *See Brown, supra* at 233. Cross-appellants assert the following language in the Option Agreement is controlling: "The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrator is strictly limited." Record, No. 7, Cross–Petition for Rule to Show Cause, Exhibit 2 ¶ 10. The Client Agreement contains an identical clause. The fundamental difference between the agreements on the issue of judicial review is that the Client Agreement, as noted above, contains a qualifying provision stating *de novo* review will be applicable under certain circumstances, one being when the client loses $100,000 in principal and is awarded no damages at arbitration. Record, No. 7, Petition for Rule to Show Cause, *supra,* Exhibit B, Client Agreement.

¶ 31 When these agreements are read together, it becomes apparent that to give effect to the provisions contained in both documents we must treat the Client Agreement qualifying provision in a manner that accords with how it reads. Both the Client Agreement and Option Agreement state judicial review of an arbitration award will be "strictly limited." The Option Agreement incorporates all provisions of the Client Agreement by reference. This includes the provision which sets forth particular circumstances under which *de novo* review is appropriate. Reading these agreements in the manner cross-appellants urge would result in the violation of two rules of construction. First, cross-appellants' reading of the agreements would result in the nullification of the qualifying provision in the Client Agreement. *See Brown, supra* at 233. Second, cross-appellants' interpretation of the agreements would result in a situation whereby the more general Option Agreement arbitration language would control

the more specific Client Agreement arbitration language. *Baltic Dev. Co., supra* at 416, 257 A.2d at 543. We decline, therefore, to accept cross-appellants' reading of the agreements.

¶ 32 Cross-appellants also assert the Client Agreement was never properly established or authenticated by appellants and, hence, the arbitration dispute was governed by NASD Rule 10301(a), which grants brokerage customers the right to bring a claim against a broker through arbitration but does not provide for *de novo* review over an eventual arbitration award.

¶ 33 The court admitted the Client Agreement into evidence and there is nothing on record to demonstrate the authenticity of the agreement was seriously challenged at any point. In fact, cross-appellants themselves offered the document into evidence at the arbitration hearing. N.T., Arbitration Hearing, Vol. V, 1/22/05, at 1028.

¶ 34 The standard of review for considering an evidentiary ruling by the trial court is exceedingly narrow. *Potochnick v. Perry,* 861 A.2d 277, 282 (Pa.Super.2004). "The admission or exclusion of evidence is a matter within the sound discretion of the trial court, which may only be reversed upon a showing of a manifest abuse of discretion." *Potochnick, supra* at 282, *quoting Eichman v. McKeon,* 824 A.2d 305, 319 (Pa.Super.2003). "To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Potochnick, supra* at 282, *quoting Ettinger v. Triangle–Pacific Corp.,* 799 A.2d 95, 110 (Pa.Super.2002). The requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. Pa.R.E. 901, **Authentication and Identification.**

¶ 35 We conclude the lower court did not abuse its discretion because the record demonstrates sufficient evidence to support a finding that the Client Agreement is what its proponent claims (whether that be appellants or cross-appellants), thereby satisfying Pa.R.E. 901. As such, the court's decision to admit the Client Agreement as authentic will not be disturbed.

¶ 36 Additionally, cross-appellants should not dispute the authenticity of the Client Agreement when they admitted it into evidence themselves. *See Robeson v. Schuylkill Navigation Co.,* 3 Grant 186, 189 (Pa.1855) ("When a party admits a letter or other document to be evidence, by using it as such, he cannot afterwards deny the authenticity when his opponent desires to use it."), *accord* P.L.E.2d Evidence § 233, **Foundation Required for Authentication** (Bender & Co., 2002).

¶ 37 Inasmuch as we have concluded the Client Agreement was properly admitted into evidence, cross-appellants' argument that the arbitration dispute was governed by the NASD rules is rendered moot.

¶ 38 Cross-appellants' final challenge to the *de novo* review clause in the Client Agreement is that the Client Agreement also contains a clause stating an appeal from an arbitration award will be "strictly limited." Cross-appellants construe these two clauses as creating ambiguity in the Client Agreement and, as such, aver parol evidence indicating Raymond James never intended the *de novo* review clause to be controlling is dispositive. They also point to *Schoch v. InfoUSA, Inc.,* 341 F.3d 785 (8th Cir.2003), for the proposition that if "parties could contract for heightened judicial review, [over FAA governed arbitration awards] the parties intent to do so must be clearly and unmistakably expressed."

¶ 39 The question as to whether a contract is ambiguous is a question of

law subject to plenary review. *Thomas Rigging & Constr. Co. v. Contraves, Inc.,* 798 A.2d 753, 755 (Pa.Super.2002) (citations omitted). A contract is ambiguous if it is reasonably susceptible to different constructions. *Id.* When the terms of a contract are clear and unambiguous, the intent of the parties will be established from the contract itself without the aid of parol evidence. *Id.* A contract is not ambiguous if the court can determine its meaning without any guide other than knowledge of the simple facts on which, from the nature of the language in general, its meaning depends. *Baney v. Eoute,* 784 A.2d 132, 136 (Pa.Super.2001) (citation omitted). A contract is not rendered ambiguous by the mere fact the parties do not agree on the proper construction. *Id.*

¶ 40 The *de novo* review clause in the Client Agreement purports to be effective only under certain and specific circumstances:

> We agree that both parties will have a right to appeal the decision of the arbitrators *if* the arbitrators award damages that exceed $100,000; the arbitrators do not award damages and the amount of my loss of principal exceeds $100,000; or the arbitrators award punitive damages.

Record, No. 7, Petition for Rule to Show Cause, *supra,* Exhibit B, Client Agreement. (Emphasis added).

¶ 41 We conclude the Client Agreement is unambiguous as it relates to the precise factual situation at hand. From a plain reading of this provision, there can be no dispute the *de novo* review clause governs the review of an arbitration award when the client is awarded nothing in arbitration but suffered a loss of principle in excess of $100,000. The use of the term "strictly limited" does not refer to a standard of review that exists in either the federal arbitration schematic or the Pennsylvania arbitration schematic. While the term

"strictly limited" could mean the parties are bound by an arbitration award without recourse, the use of the word "limited" indicates there are exceptions to this general rule. These exceptions are contained in the qualifying provision that states when *de novo* review is applicable. Under the agreements, regardless of what the term "strictly limited" was intended to mean, as a matter of law parol evidence is inadmissible to demonstrate the plain language of the Client Agreement allowing for *de novo* review does not mean what it unequivocally states. *Thomas Rigging & Constr. Co., supra* at 755.

¶ 42 Accordingly, we find the *de novo* review clause in the Client Agreement governs the conduct of the parties in this matter. Raymond James' unilateral attempt at modifying the Client Agreement through the inclusion of the words "automatic modification" in the Client Agreement and the use of a mass mailing is rejected. With respect to the issue of arbitration, the specific language of the *de novo* review clause in the Client Agreement governs over the non-specific use of the term "strictly limited" in the Option Agreement, as the agreements must be construed as one in a manner which does not lead to the nullification of provisions in either. Additionally, we find the court did not abuse its discretion in considering the Client Agreement as an authenticated contract. Finally, we find the *de novo* review clause is unambiguous with respect to the applicable standard of review when the precise factual matter at hand arises.

## II. Does the Arbitration Agreement Come Under the Auspices of the Federal Arbitration Act or the Pennsylvania Uniform Arbitration Act and What Case Law Governs the Dispute as to Whether the *De Novo* Review Clause is Enforceable?

¶ 43 All parties to this dispute have stipulated that the arbitration agreement was

created under the Federal Arbitration Act, although neither the Client Agreement nor the Option Agreement contains a choice of law clause indicating whether the arbitration agreement is enforceable under state or federal law. A thorough reading of the Federal Arbitration Act (FAA), however, reveals this stipulation to be apt:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2, **Validity, irrevocability, and enforcement of agreements to arbitrate.**[6]

¶ 44 Despite this stipulation, we still must determine whether the *de novo* review clause is enforceable, either as a matter of federal law or Pennsylvania law.[7] If we conclude the FAA standards of review are controlling, we will be bound by Supreme Court and Third Circuit case law interpreting these provisions in determining whether the *de novo* review clause is enforceable. If we find the Pennsylvania standards of review are controlling, we will need to develop a rule of law in Pennsylva-

nia answering the question of whether *de novo* review clauses are enforceable.

 ¶ 45 The FAA does not create independent grounds for federal subject matter jurisdiction. *See* 9 U.S.C. § 1 *et seq.*, **Arbitration**, *accord Morgan Stanley Dean Witter Reynolds Inc. v. Gekas*, 309 F.Supp.2d 652, 655 (M.D.Pa.2004), *citing Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n. 32, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), *Southland Corp. v. Keating*, 465 U.S. 1, 15 n. 9, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984), *BT Alex Brown, Inc. v. Monahan*, No. 97–7245, 1997 WL 773095, * 2, 1997 U.S. Dist. LEXIS 19793, 5–6 (E.D.Pa.1997). Without complete diversity between the parties under 28 U.S.C.S. § 1332, **Diversity of citizenship, amount in controversy, costs,** therefore, parties to an arbitration agreement created under the FAA are required to submit an appeal from an arbitration award to state trial courts in the first instance. *Id.*

¶ 46 This statutory scheme raises a vexing question. As the court below noted in its Opinion:

> The Pennsylvania appellate courts have never addressed the issue of whether the federal or state standards of review govern a petition filed in the Pennsylvania state courts to enforce or vacate an arbitration award entered in an arbitration proceeding governed by the Federal Arbitration Act.

---

**6.** We note we have jurisdiction to determine whether federal or state law applies based on the lower court's factual finding that federal law applies. *See Duquesne Light Co. v. New Warwick Mining Co.*, 443 Pa.Super. 53, 660 A.2d 1341, 1343–1344 (1995), *citing Emlenton Area Municipal Auth. v. Miles*, 378 Pa.Super. 303, 548 A.2d 623, 625 n. 2 (1988).

**7.** In *Duquesne*, this Court was faced with a somewhat similar situation as the one we now have before us. The parties in *Duquesne* disputed the issue of whether federal or Pennsyl-

vania arbitration law rendered their arbitration agreement enforceable. This Court put off a determination as to which law applied because the trial court had failed to make a finding of fact indicating which law applied. *Id.* at 1343–1344. The Court declined to remand the case for a finding on that matter and simply reviewed the case by analyzing the arbitration award under both the FAA and the Pennsylvania standards of review. *Id.* at 1344.

Trial Court Opinion, Wettick, J., 3/4/95, at 7.

¶ 47 The court opted to apply the "manifest disregard for the law" standard of review developed by federal courts to review arbitration awards unaccompanied by a written Opinion, stating that without controlling precedent it was the trial court's choice as to what law should be applied. Trial Court Opinion, Wettick, J., 6/28/05, at 4, *quoting GMS Group, LLC v. Benderson*, 326 F.3d 75, 77–78 (2d Cir. 2003).[8]

¶ 48 In determining whether a federal or state law standard of review is applicable to the question of whether a *de novo* review clause is enforceable, we must look to judicial application of the doctrine of pre-emption in the FAA context. The United States Supreme Court has consistently applied this analysis to potential conflicts of law arising under the auspices of the FAA and a few state courts have followed suit.

¶ 49 The FAA contains no express pre-emptive provision and it does not reflect a Congressional intent to occupy the entire field of arbitration. *Volt Information Sciences, Inc. v. Board of Trustees of the Leland Stanford Junior University*, 489 U.S. 468, 477, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989), *citing Bernhardt v. Polygraphic Co.*, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956). Even when Congress has not completely displaced state regulation in an area, however, state law may nonetheless be pre-empted to the extent that it conflicts with federal law; that is, to the extent that it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress". *Volt* at 477, 109 S.Ct. 1248, *citing Hines v. Davidowitz*, 312 U.S. 52,

67, 61 S.Ct. 399, 85 L.Ed. 581 (1941); *accord Southland Corp. v. Keating*, 465 U.S. 1, 15–16, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). The Supreme Court has outlined the purposes and objectives of the FAA as follows:

The FAA was designed "to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate," *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219–220, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985), and to place such agreements " 'upon the same footing as other contracts,' " *Scherk v. Alberto–Culver Co.*, 417 U.S., 506, 511, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) (quoting H.R.Rep. No. 96, 68th Cong., 1st Sess., 1, 2 (1924)). While Congress was no doubt aware that the Act would encourage the expeditious resolution of disputes, its passage "was motivated, first and foremost, by a congressional desire to enforce agreements into which parties had entered." *Byrd*, 470 U.S. at 220, 105 S.Ct. 1238 … [The FAA] simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n. 12, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (the Act was designed "to make arbitration agreements as enforceable as other contracts, but not more so").

*Volt, supra* at 478, 109 S.Ct. 1248.

¶ 50 The standards of review under the FAA and the Pennsylvania Uniform Arbitration Act are strikingly similar. The FAA provides the following standards of review over an arbitration award:

---

**8.** The "manifest disregard for the law" standard is exceedingly narrow and will lead to affirmation of an arbitration award for any colorable justification, even if the arbitrators committed an error of law or fact. *See GMS Group, LLC v. Benderson*, 326 F.3d 75, 78 (2d Cir.2003).

(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evidence of partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10, **Same; vacation; grounds, rehearing.**

¶ 51 The Pennsylvania Uniform Arbitration Act sets forth the following standards of review for common law arbitration awards:

The award of an arbitrator in a nonjudicial arbitration which is not subject to Subchapter A (relation to statutory arbitration) or a similar statute regulating nonjudicial arbitration proceedings is binding and may not be vacated or modified unless it is clearly shown that a party was denied a hearing or that fraud, misconduct, corruption, or other irregularity caused the rendition of an unjust, inequitable or unconscionable award.

42 Pa.C.S.A. § 7341, **Common law arbitration.**[9]

◼ ¶ 52 The United States Supreme Court has not addressed the question of whether the FAA § 10 standards of review pre-empt state standards of review over arbitration awards. After careful analysis, we conclude the standards of review set forth in the Pennsylvania Uniform Arbitration Act are not pre-empted by the standards of review outlined in the FAA.

¶ 53 On five occasions, the United States Supreme Court had held that provisions of the FAA pre-empted state law arbitration provisions. In the first of these decisions, the Court reversed the California Supreme Court's interpretation of a provision in the California Franchise Investment Law,[10] which held that the Franchise Investment Law invalidated agreements to arbitrate claims pertaining to disputes over franchise agreements. *Southland Corp. v. Keating*, 465 U.S. 1, 17, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). In determining preemption applied, the *Southland* Court relied on FAA § 2 *supra* and stated:

In creating a *substantive* rule applicable in state as well as federal courts, Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements. We hold that § 31512 of the California Franchise Investment Law violates the Supremacy Clause.

*Southland Corp, supra* at 15–16, 104 S.Ct. 852 (emphasis added).

---

9. We rely on the standards of review germane to Pennsylvania's scheme of common law arbitration because neither the Client Agreement nor the Option Agreement expressly provide for statutory arbitration. *See* 42 Pa. C.S.A. § 7302, **Scope of Subchapter.** We also note that our standards of review for statutory arbitration are quite similar to both the FAA standards and our own common law standards. *See id.* § 7314.

10. Cal. Corp.Code § 31512 (West 1977).

¶ 54 The Court also turned to pre-emption doctrine in striking down the California Superior Court's interpretation of a California statute, which held that disputes between employer and employees over sales commissions must be submitted to judicial review rather than arbitration.[11] *Perry v. Thomas*, 482 U.S. 483, 492–493, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987). The Court again relied on the substantive elements embodied in FAA § 2 in applying pre-emption:

> "Section 2 [of the FAA] is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural rules to the contrary. *The effect of the section is to create a body of federal substantive law of arbitrability,* applicable to any arbitration agreement within the coverage of the act."

*Perry, supra* at 489, 107 S.Ct. 2520, *quoting Moses H. Cone Memorial Hosp., supra* (emphasis added).

¶ 55 Almost a decade later, the Court revisited FAA pre-emption analysis in *Allied–Bruce Terminix Co., Inc. v. Dobson*, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). In *Allied–Bruce*, the Court reversed the Alabama Supreme Court's application of a state statute providing pre-dispute agreements to arbitrate were not specifically enforceable.[12] *Id.* at 282, 115 S.Ct. 834. In reversing the Alabama Court, the Court relied on Congress' ability to substantively regulate interstate commerce under the Commerce Clause of the United States Constitution.[13] *Id.* at 270–273, 115 S.Ct. 834.

¶ 56 Shortly after deciding *Allied–Bruce*, the Court touched on the FAA pre-emption doctrine once again to settle a dispute in *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). The Court was confronted with a situation whereby the parties to the dispute had included a generic New York state choice of law clause in their agreement. *Id.* at 82, 115 S.Ct. 1212. Applying New York law, the arbitrators awarded the plaintiff punitive damages, even though New York precedent prohibited the awarding of punitive damages by arbitrators.[14] *Id.* The Court side-stepped the pre-emption issue by interpreting the parties' agreement *de novo* (as the agreement was initially interpreted by a District Court), finding the agreement was ambiguous as to whether punitive damages would be available. *Id.* at 87–88, 115 S.Ct. 1212. As such, it resolved the ambiguity against the drafters of the agreement and upheld the punitive damage award. *Id.*

¶ 57 In the most recent case involving the Court's application of FAA pre-emption doctrine, the Court struck down a Montana statute providing arbitration clauses were unenforceable unless they were typed in underlined, capital letters on the first page of a contract.[15] *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 688, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). Predictably, the Court premised its finding that pre-emption applied on the substantive policy of enforcing arbitration agreements underlying the FAA § 2. *Id.* at 685, 116 S.Ct. 1652.

¶ 58 The Court, however, does not always apply FAA pre-emption doctrine to

11. Cal. Lab.Code § 229 (West 1971).

12. Ala.Code. § 8–1–41 (1993).

13. U.S. Const. Art. I § 8 cl. 3.

14. The New York case at issue in *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), is *Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 386 N.Y.S.2d 831, 353 N.E.2d 793 (1976).

15. Mont.Code. Ann. § 27–5–114(4) (1995).

potential conflicts of law. *See Volt Information Sciences, Inc. v. Board of Trustees of the Leland Stanford Junior University,* 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). In *Volt,* the question before the Court was whether a provision in the California arbitration statute permitting courts to stay arbitration pending the outcome of related litigation conflicted with the objectives of FAA § 2.[16] The Court refused to pre-empt the California statutory provision at issue, and gave the following justification for reaching this conclusion:

> There is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate.

*Volt, supra* at 476, 109 S.Ct. 1248.

¶ 59 With this jurisprudence in mind, we now turn to an analysis of whether the enforceability of the *de novo* review clause is an issue of federal or state law.

¶ 60 Comparing the results of *Volt* with other Supreme Court FAA pre-emption cases, a distinct dichotomy emerges. Whereas the laws and precedents at issue in *Southland, Perry, Allied–Bruce,* and *Casarotto* were inherently *substantive* in the sense they affected the enforceability of the underlying arbitration agreement, the California stay provision at issue in *Volt* was inherently *procedural* and did not affect the enforceability of the underlying arbitration agreement. The Supreme Court consistently has applied pre-emption in situations where a state (either judicially, legislatively, or both) has acted to render arbitration agreements governed by the FAA unenforceable. In *Volt,* the Court declined to find FAA pre-emption, implying pre-emption was inappropriate when the state rule of law in question was a procedural one having no effect on the enforcement of an underlying arbitration agreement.

¶ 61 Thus, there is a clear rationale behind these seemingly disparate results. The Supreme Court's own language reinforces the conclusion that pre-emption will not be used to eviscerate state procedural arbitration rules when such rules have no effect on the enforceability of the underlying agreement. In distinguishing *Casarotto* from *Volt,* the Supreme Court had this to say:

> The Montana Supreme Court misread our *Volt* decision and therefore reached a conclusion in this case at odds with our rulings. *Volt involved an arbitration agreement that incorporated state procedural rules,* one of which, on the facts of that case, called for arbitration to be stayed pending the resolution of a related judicial proceeding. The *state rule examined in Volt determined only the efficient order of proceedings; it did not affect the enforceability of the arbitration agreement itself.*

*Casarotto, supra* at 688, 116 S.Ct. 1652 (emphasis added).

¶ 62 As was mentioned previously, the *Volt* decision also contains language supporting the distinction between substantive rules having an effect on enforceability and procedural rules having no effect on enforceability. *See Volt, supra* at 476, 109 S.Ct. 1248 (stating "[t]here is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate."). The Court stated:

> While we have held that the FAA's *"substantive"* provisions— §§ 1 and 2—are applicable in state as well as federal

---

**16.** Cal.Civ.Proc.Code Ann. § 1281.2(c) (Deering 2006).

court, *see Southland Corp. v. Keating,* 465 U.S. 1, 12, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984), we have never held that §§ 3 and 4, *which by their terms appear to apply only to proceedings in federal court,* see *9 U.S.C. § 3* (referring to proceedings "brought in any of the courts of the United States"); § 4 (referring to "any United States district court"), are nonetheless applicable in state court. See *Southland Corp. v. Keating, supra,* at 16 n. 10, 104 S.Ct. 852 (expressly reserving the question whether "§§ 3 and 4 of the Arbitration Act apply to proceedings in state courts"); *see also id.,* at 29, 104 S.Ct. 852 (O'Connor, J., dissenting) (§§ 3 and 4 of the FAA apply only in federal court).

*Volt* at 477 n. 6, 109 S.Ct. 1248 (emphasis added).

¶ 63 On the basis of this dichotomy, we believe the FAA standards of review cannot pre-empt the Pennsylvania standards of review for arbitration awards unless the Pennsylvania standards of review frustrate the underlying objectives of the FAA, as standards of review are an inherently procedural mechanism used to facilitate judicial resolution of controversies *after* the underlying arbitration agreement already has been enforced in accordance with the FAA.

¶ 64 Further, we also believe the distinction between the pre-emptive import of the FAA substantive provisions and the pre-emptive import of the FAA procedural provisions (such as § 10) is borne out by the principles of federalism. The United States Supreme Court has stated in the past that, even though Congress has substantial powers to govern the nation directly, the Constitution has never been understood to confer upon Congress the ability to require the states to govern according to Congress' instructions. *Reno v. Condon,* 528 U.S. 141, 149, 120 S.Ct. 666,

145 L.Ed.2d 587 (2000) (citations omitted). Building on this theme, the Court has specified the following:

> In providing for a stronger central government, therefore, the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States. As we have seen, the Court has consistently respected this choice. We have always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts. *E.g., FERC v. Mississippi,* 456 U.S. 742, 762–766, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982); *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S. 264, 288–289, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); *Lane County v. Oregon,* 74 U.S. (7 Wall.) 71, 76, 19 L.Ed. 101 (1869).
>
> The allocation of power contained in the Commerce Clause, for example, authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation of interstate commerce.

*New York v. United States,* 505 U.S. 144, 166, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992).

¶ 65 We can discern no federal statutory scheme that purports to dictate the standards of review state courts will apply. Such a provision, therefore, is unprecedented. We feel it would stretch the bounds of federalism to conclude FAA § 10 mandates pre-emption based on such an antiquated historical foundation.

¶ 66 The language of FAA § 10 itself substantiates this conclusion. Section 10 explicitly states: *"the United States court in and for the district where in the award was made ..."* may vacate an arbitration award when certain circumstances are

present. We believe this phrase constitutes plain language stating that FAA § 10 only applies to proceedings in United States district courts. The United States Supreme Court repeatedly has held that when statutory language is plain, the *only* function of the courts is to enforce the statute according to its terms, unless such enforcement would result in absurdity. *Lamie v. United States Trustee,* 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004), *citing Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000). Clearly, Pennsylvania law employs a similar principle. *See Friedman v. Grand Cent. Sanitation, Inc.,* 524 Pa. 270, 276, 571 A.2d 373, 376 (1990), *quoting* 1 Pa.C.S. § 1903(a), **Words and phrases** (reiterating "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage.").

■ ¶ 67 We need not, therefore, approach the point where interpretation of the FAA is required. The statute speaks for itself; the FAA standards of review do not apply to a state trial court's review over an arbitration award created and enforced under the FAA. Additionally and in light of the foregoing discussion, we also do not feel this result is absurd. *See Lamie, supra* at 534, 124 S.Ct. 1023.

■ ¶ 68 The only question remaining is whether common law arbitration standards of review as set forth in 42 Pa.C.S.A. § 7341, **Common Law Arbitration,** violate the core objective and principles underlying the FAA. *See, e.g., Volt, supra* at 477, 109 S.Ct. 1248. As discussed above, the primary purpose of the FAA is to overcome judicial hostility towards arbitration, without displacing state arbitration schemes, by giving arbitration agreements equal standing with other contractual agreements, by requiring courts to enforce arbitration agreements pursuant to their terms. *Id.* at 478, 109 S.Ct. 1248.

¶ 69 Cross-appellants would define the issue before us as whether parties are free to dictate the scope of litigation following enforcement of an arbitration agreement, not the enforceability of the agreement itself. Additionally, as detailed above, Pennsylvania common law arbitration standards of review are on par with those outlined in FAA § 10, and promote the goals of enforcing arbitration agreements and placing arbitration agreements "upon the same footing as contracts." *Volt, supra* at 478, 109 S.Ct. 1248.

■ ¶ 70 In Pennsylvania, contracting parties are not free to impose their own standards of review on a court and the parties to an arbitration agreement receive no support for doing so under the guise of arbitration, thereby putting those agreements in a superior position. We conclude, therefore, that the standards of review outlined in 42 Pa.C.S.A. § 7341 facilitate rather than impede the goals of the FAA. In so finding, we hold that the standards of review outlined in 42 Pa. C.S.A. § 7341 are not pre-empted by FAA § 10. Accordingly, Pennsylvania law governs the question of whether parties can impose *de novo* review on our trial courts by virtue of contractual agreements.

III. **Pursuant to Pennsylvania Law, is a Contractual Provision Providing for *De Novo* Review Over an Arbitration Award by a Trial Court Enforceable?**

■ ¶ 71 Turning now to an equally vexing question, we find that no Pennsylvania case speaks directly to the scenario we have before us. Additionally, federal persuasive authority on the issue *sub judice* is sparse and inconsistent.

¶ 72 Unsure as to whether federal or Pennsylvania law governs the dispute at hand, appellants point to a number of cases decided in various federal circuits and a number of Pennsylvania cases that do not directly address the factual situation with which we are presented, in an attempt to demonstrate the reviewing court's decision to render the *de novo* review clause unenforceable was unfounded. In support of their argument, appellants aver we should enforce the *de novo* review clause for a number of reasons. First, they contend enforcement would not create a jurisdictional quandary because the trial court already has jurisdiction to review arbitration awards. Second, they point to case law holding parties are free to contract for a review for errors of law pursuant to the 1927 Arbitration Act and, by analogy, should also be free to contract for factual and legal *de novo* review. Appellants' third averment is there is no express statutory provision prohibiting parties from contracting for *de novo* review and, therefore, the *de novo* review clause must be enforceable. They also maintain Pennsylvania courts construe arbitration agreements as they are drafted, and by doing so in this case, future parties to a contract will be encouraged to enter into arbitration agreements because parties will have the ability to prescribe judicial protection against erroneous arbitration awards. Appellants' final averment is that rendering the *de novo* review clause unenforceable frustrates the clear intent of the parties.

¶ 73 Appellants correctly point out there is very little Pennsylvania case law even collaterally dealing with the issue of whether a *de novo* review clause contained in an arbitration agreement is enforceable. We start with this Court's recent interpretation of the statutory standards of review for common law arbitration:

> The review of a common law arbitration award is narrowly circumscribed. This is because the law favors non-judicial dispute resolution that the parties have agreed to. Alternate dispute resolution is economical in terms of time, expenditure of judicial resources and transactional costs. Limited judicial review also imposes finality in a contested matter. To permit anything but limited judicial review defeats the purpose of ... arbitration.

*F.J. Busse Co. v. Sheila Zipporah L.P.,* 879 A.2d 809, 811 (Pa.Super.2005), *appeal denied,* 587 Pa. 694, 897 A.2d 457 (2006), *quoting Boulevard Assocs. v. Seltzer P'ship.,* 445 Pa.Super. 10, 664 A.2d 983, 987 (1995) (citation omitted).

> The award of an arbitrator in a nonjudicial arbitration ... is binding and may not be vacated or modified unless it is clearly shown that a party was denied a hearing or that fraud, misconduct, corruption or other irregularity caused the rendition of an unjust, inequitable or unconscionable award.

*Id., quoting Gargano v. Terminix Int'l. Co.,* 784 A.2d 188, 193 (Pa.Super.2001).

¶ 74 Furthermore, the "arbitrators are the final judges of both law and fact, and an arbitration award is not subject to reversal for a mistake of either." *Id., citing Gargano, supra* at 193. Neither this Court nor the trial court, therefore, may retry the issues addressed in an arbitration proceeding or review the arbitrators' disposition of the merits of the case. *Id., citing McKenna v. Sosso,* 745 A.2d 1, 4 (Pa.Super.1999).

¶ 75 Turning now to appellants' argument, we find their first averment in support of their argument to be unpersuasive. The fact that Pennsylvania trial courts have jurisdiction to review an arbitration

award under limited statutorily outlined circumstances does not enlarge the scope of the court's authority to permit review of an award *de novo*. Obviously, if we were to find the *de novo* review clause enforceable, we would need to find the trial court had plenary jurisdiction over the matter.

¶ 76 Appellants next rely on *Nationwide Mutual Insurance Co. v. Heintz*, 804 A.2d 1209 (Pa.Super.2002), and aver parties are free to contract for *de novo* review by analogy because the *Heintz* Court determined parties can elect to invoke the standard of review under the 1927 Pennsylvania Arbitration Act, thereby enabling the trial court to consider an arbitration panel's errors of law. Appellants' brief at 34.

¶ 77 Appellants' averment is flawed. In *Heintz*, we stated:

The Act of 1980 preserved the scope of review for arbitration agreements under the Act of 1927. 42 Pa.C.S.A. § 7302(d)(2). Specifically, a "court asked to review an arbitration award made under the provisions of the Act of 1927 may modify or correct the award where it is 'contrary to law and is such that had it been a verdict of a jury the court would have entered a different judgment or a judgment notwithstanding the verdict.' "

*Heintz* at 1214, *quoting Krakower v. Nationwide Mut. Ins. Co.*, 790 A.2d 1039, 1040 (Pa.Super.2001) (citations omitted).

¶ 78 In this Commonwealth, a judgment notwithstanding the verdict will be entered only in a clear case, when after viewing the evidence in a light most favorable to the verdict winner, no two reasonable minds could fail to agree that the verdict was improper. *Murray v. Philadelphia Asbestos Corp.*, 433 Pa.Super. 206, 640 A.2d 446, 449 (1994) (citations omitted). Thus, while 42 Pa.C.S.A. § 7302(d)(2) does provide a legislative mandate for reviewing an arbitration pan-

el's alleged errors of law, this review is still very limited. It does not follow that this Court has the authority to expand this legislatively prescribed limited legal review to allow expansive *de novo* review of an arbitration panel's legal conclusions. We must, therefore, reject appellants' second averment in this regard.

¶ 79 Appellants next aver that because the Pennsylvania Uniform Arbitration Act does not expressly prohibit parties from agreeing to *de novo* review, it must therefore be lawful. They fail to cite to any authority for this untenable proposition. Appellants however do point to comments contained in the drafting history of the Revised Uniform Arbitration Act of 2000 ("RUAA") in an attempt to find support.

¶ 80 Appellants' averment is self-defeating. First, Pennsylvania has not adopted the RUAA. Second, appellants point out the RUAA does not contain a provision allowing parties to contract for heightened judicial review of arbitration awards. Finally, the RUAA comments to which appellants cite explicitly state the drafters were worried about including a provision allowing for contractually created heightened review because such a clause could be pre-empted by federal law, would defeat the RUAA goal of making arbitration a binding alternative for dispute resolution, and would threaten the very integrity of the RUAA as a template for state arbitration acts. Appellants' brief at 35, *citing* **Uniform Laws Annotated, Master Edition** (2005), Vol. 7, at 6 and 79. We cannot discern any support for appellants' overall position within this RUAA commentary. To the contrary, we feel citation to these comments only serves to damage their argument.

¶ 81 Appellants next contend that by permitting parties to contract for heightened standards of review over arbitration

awards, arbitration will be encouraged because it "will allow future parties to seek to resolve their disputes through arbitration in the first instance while at the same time reserving judicial protection from erroneous arbitration decisions, thereby adding to the desirability of arbitration as a dispute-resolution process." Appellants' brief at 35.

¶ 82 We find this averment to be highly questionable. By permitting *de novo* review over arbitration awards, parties would be dissuaded from contracting for arbitration because it would be a meaningless gesture that could result in a time consuming and cost absorbing preliminary review that would then be followed by an even more expensive *de novo* trial. Under these circumstances, parties would benefit by proceeding to the trial court in the first instance. Enforcing *de novo* review clauses, therefore, would actually provide a disincentive for entering into arbitration agreements.

¶ 83 Appellants' final contention is that finding the *de novo* review clause unenforceable frustrates their intent. Unquestionably, party intent as evinced by the words of an agreement is a paramount consideration in construing a contract. *See Hart v. Arnold*, 884 A.2d 316, 332 (Pa.Super.2005), *appeal denied*, 587 Pa. 695, 897 A.2d 458 (2006) (citations omitted). Appellants' averment, however, places the cart before the horse. If we determine clauses providing for *de novo* review of arbitration awards are unenforceable as a matter of law within the Commonwealth, a party's intentions pertaining to the creation of such a clause are irrelevant.

¶ 84 We conclude, therefore, appellants' argument as to why we should enforce the *de novo* review clause as a matter of Pennsylvania law is wholly unpersuasive. The question thus becomes whether Pennsylvania case law that collaterally deals with the issue and federal persuasive authority has any influence as a legal matter and whether the court's objections to enforcing the *de novo* review clause have merit as a practical matter.

¶ 85 The only statements in this Court's jurisprudence pertaining to the enforceability of clauses providing for *de novo* review of an arbitration award are contained within dicta. Previously, this Court has considered only two appeals dealing with the enforceability of such a clause; neither case ruled as a matter of law such clauses are enforceable. In *Hiller v. Allstate Insurance Co.*, 300 Pa.Super. 149, 446 A.2d 273 (1982), appellants challenged a trial court's decision that the dispute at hand was outside the scope of the arbitration clause contained within the parties' agreement. Appellants relied on a purported *de novo* review clause in raising the challenge. *Id.* at 274. We quashed the appeal on the basis of precedent holding a trial court's ruling as to whether a specific dispute is encompassed by a common law arbitration agreement is unappealable. *Id.* at 275. We were unable, therefore, to reach the issue of whether the clause itself was enforceable as a matter of law. With respect to the *de novo* review clause, we stated the following:

> We grant that the arbitration clause is an unusual one. It appears to make the scope of the agreement for binding arbitration depend on what the arbitrators determine the value of the claim to be. However, the question of whether parties may lawfully make such an agreement, either as a matter of general arbitration law or as a matter of uninsured motorist insurance law, is not before us and we intimate no opinion regarding it.

*Id.* at 274.

¶ 86 In *Zook v. Allstate Insurance Co.*, 349 Pa.Super. 328, 503 A.2d 24 (1986), the

appellant challenged the trial court's refusal to grant *de novo* review of an arbitration award pursuant to contract. We affirmed the trial court ruling on the basis of ambiguity in the purported *de novo* review clause at issue. *Id.* at 27. Consequently, we did not reach the question of whether a properly framed *de novo* review clause would be enforceable as a matter of law. We did state the following, however, in dicta:

> We know of no authority for the proposition that any court in our Commonwealth has the jurisdiction to void the decision of a common law arbitration, and to conduct a trial *de novo*, in the absence of fraud, misconduct, corruption or other similar irregularity.

*Id.* at 27.

¶ 87 The Commonwealth Court also has had occasion to touch on the subject. In *American Federation of State, County and Municipal Employees v. State College Area School District*, 101 Pa.Cmwlth. 596, 516 A.2d 869 (1986), *allocatur denied*, 516 Pa. 614, 531 A.2d 781 (1987), the Court reversed a trial court's decision to rely on a general review clause in a contract in granting a *de novo* hearing to review an arbitration award. The rationale behind this decision was that the trial court's interpretation of the general review clause conflicted with the Pennsylvania standards of review over statutory arbitration awards and, as such, ran afoul of The Public Employees Relations Act providing that no clause in a collective bargaining agreement could legally conflict with a statute already in existence and, therefore, the trial court's interpretation of the general review clause

was in error.[17] *Id.* at 872. In making this determination, the Court stated:

> In reviewing an arbitration award, the trial court, in this posture, sits as an appellate court. Its scope of review is limited to a review of the record presented to it, and the trial court does not have the authority to hold a *de novo* hearing.

*Id.* at 871.

¶ 88 The Commonwealth Court cited to this principle in *Borough of Dormont v. Dormont Borough Police Dep't.*, 654 A.2d 69 (Pa.Commw.Ct.1995), *allocatur denied*, 541 Pa. 628, 661 A.2d 875 (1995), *citing American Federation, supra*, in dismissing the appellants' argument that the trial court had erred by refusing to allow the parties to offer evidence and testimony during review of an arbitration award.

¶ 89 More recently, the Commonwealth Court again cited to this principle in determining that a trial court's decision to enter deposition testimony while reviewing an interest arbitration award was in error. *West Pottsgrove Twp. v. West Pottsgrove Police Officers' Association*, 791 A.2d 452, 458 (Pa.Commw.Ct.2002), *citing Dormont, supra*.

¶ 90 Intensive review of these cases demonstrates that while no binding state authority exists on the point before us, the prevailing sentiment in Pennsylvania case law is *de novo* review clauses should be viewed with disfavor. Additionally, the majority of state courts that have considered enforcing *de novo* review clauses contained in arbitration agreements enforced under state law have voided them.[18]

---

17. 43 P.S. § 1101.703.

18. *See, e.g., Goulart v. Crum & Forster Pers. Ins. Co.*, 222 Cal.App.3d 527, 271 Cal.Rptr. 627 (1990); *Mendes v. Automobile Ins. Co.*, 212 Conn. 652, 563 A.2d 695 (1989); *Schmidt v. Midwest Mut. Ins. Co.*, 426 N.W.2d 870 (Minn.1988); *John T. Jones Constr. Co. v. City of Grand Forks*, 665 N.W.2d 698 (N.D.2003); *Schaefer v. Allstate Ins. Co.*, 63 Ohio St.3d 708, 590 N.E.2d 1242 (1992); *Pepin v. Am. Universal Ins. Co.*, 540 A.2d 21 (R.I.1988).

¶ 91 After a careful review of all of the available case law from jurisdictions across the country in conjunction with this Commonwealth's case law, it is indisputable that the Commonwealth as well as the majority of state and federal jurisdictions either disfavor and/or expressly prohibit private parties from contracting for broad standards of review over arbitration awards. Before reaching a conclusion on this matter, however, we must give consideration to the practical ramifications of enforcing *de novo* review clauses as we do not have a direct precedent commanding us to resolve the issue one way or the other.

¶ 92 In finding the *de novo* review clause was unenforceable pursuant to federal law, the court below pointed to four justifications. Trial Court Opinion, Wettick, J., 3/4/05, at 24–25. First, it proposed that enforcement of the *de novo* review clause would result in a bypassing of arbitration awards. Second, it noted enforcing the *de novo* review clause would undermine the judicial process. In forwarding this contention, the hearing judge concluded the trial court should not be required to sit as a trier of fact while simultaneously being stripped of the ability to ask questions of witnesses and determine the scope of testimony. Third, he noted *de novo* review would not necessarily lead to the conservation of judicial resources as the trial court is stripped of its ability to cut down on the admission of testimony, transcripts, and documents. The court's final justification for finding the *de novo* clause unenforceable is that there are no established procedures for how a trial court would go about conducting *de novo* review over an arbitration award.[19]

¶ 93 Appellants counter all of these justifications. With respect to the court's first conclusion, namely that *de novo* review will render arbitration essentially meaningless, appellants' raise a number of counterpoints. First, appellants cite United States Supreme Court precedent, *First Options of Chicago v. Kaplan*, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *Allied–Bruce Terminix Co., Inc.*, 513 U.S. 265, 281, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995); and *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985), for the general proposition that arbitration agreements should be enforced according to their terms even if such an agreement does not provide for the most efficient

Furthermore, federal courts sitting in diversity also have held heightened review clauses are void as a matter of state law. *See, e.g.,* *O'Neill v. Berkshire Mut. Ins. Co.*, 786 F.Supp. 397 (D.Vt.1992); *Field v. Liberty Mut. Ins. Co.*, 769 F.Supp. 1135 (D.Haw.1991).

A few jurisdictions have upheld heightened review clauses. *See, e.g., Liberty Mut. Fire Ins. Co. v. Mandile*, 192 Ariz. 216, 963 P.2d 295 (Ct.App.1997); *Roe v. Amica Mut. Ins. Co.*, 533 So.2d 279 (Fla.1988); *Nat'l. Gen. Ins. Co. v. Riddell*, 705 N.E.2d 465 (Ind.Ct. App.1998); *Cohen v. Allstate Ins. Co.*, 231 N.J.Super. 97, 555 A.2d 21 (App.Div.1989).

19. With respect to this final contention, the court pointed to the following as examples of questions that would arise if the *de novo* review clause were deemed enforceable:

Does the trial court judge enter an award, a decision, or a judgment? Is the trial court required to make findings of fact and conclusions of law; does this depend on whether the arbitrators were required to do so? Are there additional steps that must be taken by a party who is satisfied with the ruling of the trial judge, such as filing a petition to confirm an arbitration award? Does a party who is dissatisfied with the ruling of the trial court file a petition with the trial court to vacate the arbitration award, a motion for post-trial relief, or a direct appeal to the appellate courts? What issues may be presented to the appellate courts and how are they raised/preserved? What is the role of the appellate courts? Trial Court Opinion, Wettick, J., 3/4/05, at 25– 26.

resolution of a dispute. Second, they point to our decision in *Brown v. D & P Willow, Inc.*, 454 Pa.Super. 539, 686 A.2d 14 (1996), for the proposition that this Court cannot convert a non-binding dispute resolution agreement into a binding agreement without party consent. Finally, appellants argue non-binding arbitration is provided for under 42 Pa.C.S.A. § 7361, **Compulsory arbitration**, and under 10 P.S. § 378(i)(3), **Unfair competition with small businesses**, and, therefore, we should not be hostile to such review over arbitration awards.

¶ 94 Appellants' averments with respect to the hearing court's first conclusion are unpersuasive. The United States Supreme Court precedent they cite deals with the enforceability of arbitration agreements themselves, not with standards of review. Similarly, *Brown* is not on point and lends little to appellants' position as it dealt with a situation whereby the trial court attempted to render an arbitration award binding when the parties to the litigation had no agreement to arbitrate in the first place. *Brown, supra* at 17. Appellants' statutory argument is self-defeating in that they point out the state legislature has provided for non-binding arbitration in certain circumstances. This only begs the question as to why they failed to draft broad standards of review under 42 Pa.C.S.A. § 7341. Clearly, the state legislature was capable of doing as much, and their decision to prescribe the standards of review contained in section 7341 indicates they did not intend common law arbitration to be non-binding.

¶ 95 Appellants also counter the court's determination that allowing *de novo* review would undermine the judicial process because it would eliminate a trial court's ability to dictate the scope and quality of the evidence entered into record. In doing so, appellants again point to various judicial interpretations of statutes which explicitly provide for heightened standards of review over administrative adjudications. Appellants also argue this Court affirmed a trial court's decision to accept stipulated records on appeal from arbitration awards in *Jackson v. Travelers Ins. Co.*, 414 Pa.Super. 336, 606 A.2d 1384 (1992). Finally, they aver the court expressed no reservations about the record in this case.

¶ 96 Appellant's assertions in this regard hold little persuasive value. Appellants point to various courts' plain readings of 47 P.S. § 4–471(b), **Liquor Code–Revocation and suspension of licenses; fines; 10 P.S. § 378(i)(9), Unfair competition with small businesses; 53 P.S. § 67305(c), Hearing; report; exceptions thereto; view and notice;** and, 24 P.S. § 17–1717–A(g), **Establishment of Charter School**, in an attempt to show the *de novo* review "is routinely undertaken in other circumstances".[20] As discussed above, this argument is self-defeating because it indicates the legislature intentionally omitted broad standards of review from 42 Pa.C.S.A. § 7341. With respect to appellants' assertion that this Court affirmed a trial court's decision to accept stipulated records for conducting a *de novo* review of an arbitra-

---

**20.** Of these statutes, only 10 P.S. § 378(i)(9) expressly provides for factual and legal *de novo* review. While 47 P.S. 4–471(b) provides review over errors of law, it also limits the review over questions of fact pertaining to liquor licensing. Appellant's reliance on 53 P.S. § 67305(c) is wholly misplaced because it authorizes the court of common pleas to appoint a *board of viewers* to review ordi-

nances that have been passed for the purpose of authorizing the alteration of roads and highways and, therefore, the statute does not speak to judicial review. It also does not provide a standard of review. Similarly, 24 P.S. § 17–1717–A(g) provides that a *school board* can review the application for a charter school but it does, however, provide a set of criteria governing their review.

tion award in *Jackson*, appellants fail to mention the appellants in *Jackson* did not raise the issue of whether the *de novo* review was appropriate and, hence, we did not consider the issue. Appellants' declaration that the court did not express reservations about the record put before him in this case constitutes a total mischaracterization. To the contrary, the judge explicitly noted he felt he could have limited the expansive record in this case if he had conducted the trial in the first place and, hence, felt it undermined the judicial process to force trial courts to review expansive records they had no control over making *de novo*.

¶ 97 Appellants counter the court's contention that enforcing *de novo* review would require the wholesale creation of new judicial procedures by pointing to this Court's decision in *Dickler v. Shearson Lehman Hutton, Inc.*, 408 Pa.Super. 286, 596 A.2d 860 (1991), in which we held class actions could be brought through arbitration and equitable relief could be granted by an arbitration panel. Appellants rely on *Dickler* for the proposition "that the policy of encouraging arbitration and enforcing arbitration agreements as drafted outweighs the fact that the court may play an unfamiliar role in an arbitration proceeding." Appellants' brief at 44.

¶ 98 There are myriad flaws in appellants' averment. In holding the trial court would be required to certify class actions for arbitration purposes, we did not expose the trial court to anything with which they were unfamiliar. *See* Pa.R.C.P. 1708, **Criteria for Certification. Determination of Class Action as Fair and Efficient Method of Adjudication**. Additionally, it is difficult to see how permitting arbitration panels to afford equitable relief has any bearing whatsoever on the issue of how the trial courts of this Commonwealth conduct their business.

¶ 99 Finally, appellants challenge the court's contention that *de novo* review would not necessarily conserve judicial resources by suggesting it is unclear whether this contention has merit. In support of this proposition, appellants argue that if parties contract for unacceptable standards of review then trial courts will be required to determine whether the standard of review provision is severable, thereby leading to more litigation; appellants also reiterate their argument that allowing parties to contract for *de novo* review will encourage parties to enter into arbitration agreements and, consequently, will lead to more arbitration thereby preserving judicial resources in the process.

¶ 100 Appellants' assertions in this regard again miss the mark. Their first proffer presupposes that trial courts will be forced to conduct a severance analysis if an arbitration agreement contains an unlawful standard of review clause. They fail, however, to point to a single Pennsylvania case where we conducted a severance analysis of any arbitration agreement. Appellants' second assertion is counterintuitive and already has been examined in detail above.

¶ 101 We find, therefore, appellants' challenges to the hearing court's contentions to be wholly unpersuasive. In contrast, we find some of the court's concerns with enforcing *de novo* review clauses to be quite applicable.

¶ 102 Our analysis leads us to hold *de novo* review clauses contained in arbitration agreements are unenforceable as a matter of law in Pennsylvania.

## IV. Conclusion

¶ 103 In conclusion, we reiterate our holding that the standards of review contained in § 10 of the Federal Arbitration Act do not pre-empt the standards of review set forth in the Pennsylvania Uniform

Arbitration Act, 42 Pa.C.S.A. § 7341. We find, therefore, this Commonwealth's law controls the question of whether clauses providing for *de novo* review of arbitration awards are enforceable in this state.

¶ 104 As a matter of law, clauses providing for *de novo* review of arbitration awards will not be enforced in the Commonwealth.

¶ 105 Appellant raised a single issue for our review—whether the trial court should have afforded them *de novo* review over the NASD arbitration panel's award. We have thoroughly dealt with and resolved this issue. We were not asked to consider whether the "manifest disregard for the law" standard of review should have been applied. We were also not asked to review the trial court's confirmation of the arbitration panel's award. As such, we decline to reach these issues.[21]

¶ 106 Order affirmed.

¶ 107 Concurring Statement by JOHNSON, J.

CONCURRING STATEMENT BY JOHNSON, J.:

¶ 1 The Opinion by my most-distinguished colleague, Judge Tamilia, is carefully reasoned and most persuasive. How-ever, I join only so much of the Opinion as sets forth the facts, at opinion pages 554–557, and the unassailable Section III, appearing at pages 569 through 576 of the Opinion.

¶ 2 The Appellants have raised a single issue:

Is an agreement between parties that disputes between them will be resolved by arbitration and that, in the event of certain decisions of the arbitrators, either party is entitled to seek a de novo review by a court of the transcripts and exhibits of the arbitration hearing enforceable?

Brief for Appellants at 5. In the trial court, the Honorable R. Stanton Wettick, Jr., answered this question in the negative. The majority of this panel has done the same. I agree wholeheartedly both with Judge Wettick and Judge Tamilia on this narrow question.

¶ 3 The first two issues addressed by the majority, at pages 557 through 571 of the Opinion, involve important and sometimes complex considerations. Nevertheless, I am unable to agree that the resolution of either of these two issues is necessary in disposing of the sole question brought by the Appellants. Accordingly, I must de-

---

21. With regard to Judge Johnson's rationale outlined in his Concurring Opinion, we believe our analyses in Section I, regarding the *de novo* review clause, and Section II, regarding FAA preemption, are essential to the proper resolution of this case.

Section I is an essential part of the analysis in that if the *de novo* review clause does not govern the conduct between the parties then it would not be necessary to address the issue of whether the clause is enforceable as the clause would no longer be part of the contractual relationship forming the basis for this dispute and, therefore, the enforceability analysis would be moot.

As to Section II, it is necessary to determine whether Pennsylvania or federal law governs the enforceability of the *de novo* review clause. If we had determined FAA § 10 had pre-emptive import, then the question of whether the *de novo* review clause governed would require us to fashion a federal rule of law to be applied in state courts, an application which would take this Court outside the scope of its mandate. Further, if the pre-emption analysis in Section II is not undertaken, the holding in this case would be stuck in limbo, that is, it would govern Pennsylvania Courts' review of petitions for *vacatur* over arbitration awards entered pursuant to arbitration agreements enforced under the FAA, but it would not be imbedded in either federal or state law. In the final analysis, preemption as a federal or state mandate would undermine the effectiveness of arbitration.

cline to join in that portion of the Majority's excellent Opinion, since I believe that the issues considered under Sections I and II of the Opinion will be more appropriately addressed when the issues found therein are placed squarely before this or another Court in the future.